IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No.: 5:08-CV-463

CONSOLIDATION COAL COMPANY, )
)
Plaintiff, )
)
v. )
)
AMEREN CORPORATION as successor-in- )
interest to UNION ELECTRIC; AMERICAN )
ELECTRIC CORPORATION; TOWN OF )
BLACKSTONE, VIRGINIA; BONNER )
ELECTRIC, INC.; CHEVRON MINING, )
INC. as successor-in-interest to PITTSBURG )
& MIDWAY COAL MINING CO.; OWEN )
ELECTRIC STEEL COMPANY OF SOUTH )
CAROLINA, and/or SMI OWEN STEEL )
COMPANY, INC., and/or SMI STEEL d/b/a )
CMC STEEL SOUTH CAROLINA and/or )
COMMERCIAL METALS COMPANY; )
COHEN AND GREEN SALVAGE )
COMPANY, INC.; COOPER INDUSTRIES, )
INC. as successor-in-interest to ABEX INC.; )
COTTER ELECTRIC COMPANY; CITY OF )
DOVER, DELAWARE; ENDICOTT CLAY )
PRODUCTS COMPANY; HAGERSTOWN )
LIGHT DEPARTMENT; HUNTSVILLE )
UTILITIES; JET ELECTRIC MOTOR )
COMPANY; KELLY GENERATOR & )
EQUIPMENT, INC., and/or KELLY )
ELECTRICAL CONSTRUCTION, INC., )
and/or JOHN E. KELLY & SONS )
ELECTRICAL CONSTRUCTION, INC.; )
LAFARGE MID-ATLANTIC, INC. and/or )
LAFARGE MID-ATLANTIC, LLC as )
successor-in-interest to GENSTAR STONE )
PRODUCTS COMPANY and REDLAND )
GENSTAR INC.; LEWIS ELECTRIC )
SUPPLY CO., INC.; CITY OF )
MASCOUTAH, ILLINOIS; M P ELECTRIC )
CONTRACTORS, INC.; NEW SOUTHERN )
OF ROCKY MOUNT, INC.; NORTH )
CAROLINA DEPARTMENT OF )

1347629 v 1

| | |
|---|---|
| AGRICULTURE AND CONSUMER SERVICES; P.C. CAMPANA, INC.; PHOENIX SOLUTIONS COMPANY as successor-in-interest to PLASMA ENERGY COMPANY; SURRY YADKIN ELECTRIC MEMBERSHIP CORPORATION; TENNESSEE ASSOCIATED ELECTRIC and/or TENNESSEE ASSOCIATED ELECTRIC HOLDINGS, INC.; VENTECH ENGINEERS, INC., and/or VENTECH PROCESS EQUIPMENT, INC. and/or VENTECH EQUIPMENT INC. and/or THE VENTECH COMPANIES; VEOLIA ENVIRONMENTAL SERVICES WASTE-TO-ENERGY f/k/a/ MONTENAY POWER CORPORATION; W.R. SCHOFIELD CONSTRUCTION CO.; and WHEELABRATOR TECHNOLOGIES, INC., Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## COMPLAINT

Plaintiff, Consolidation Coal Company, by its attorneys, Cranfill Sumner & Hartzog LLP and Cohen & Grigsby, P.C., for its Complaint alleges as follows:

### Nature Of The Action

1. This action is brought pursuant to §§ 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a) and 9613(f), to recover the necessary response costs that Consolidation Coal Company ("Consol") and Bassett Furniture Industries, Inc. ("Bassett") have incurred and will continue to incur in performing a time critical removal action, as deemed necessary by the United States Environmental Protection Agency ("EPA"), at a site located near Mt. Herman Road and the Raleigh-Durham International Airport, Wake County, North Carolina, identified by EPA as part of the Ward Transformer Superfund Site. The part of the Ward Superfund Site that is the subject of this action encompasses approximately 20 plus acres of property owned by Ward Transformer

1347629 v 1

2

Company and/or Ward Transformer Sales and Service, Inc. (collectively "Ward"), as well as parts of adjoining properties owned by certain parties related to Ward and parts of other properties owned by certain other parties unrelated to Ward. (Said part of the Ward Superfund Site is hereinafter referred to as the "Ward Site.")

**Jurisdiction and Venue**

2. As provided in 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331, this Court has subject matter jurisdiction over the claims asserted pursuant to 42 U.S.C. §§ 9607(a) and 9613(f) and 28 U.S.C. § 2201.

3. As provided in 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b), venue in this District is proper because the releases of hazardous substances and the damages associated therewith occurred at the Ward Site which is located in the vicinity of Mount Herman Road and the Raleigh-Durham International Airport, in Wake County, North Carolina, which is within this District.

**Removal Action Performing Parties**

4. Plaintiff Consol is a Delaware corporation with its office and principal place of business at CNX Center, 1000 CONSOL Energy Drive, Canonsburg, Pennsylvania 15317. Former subsidiaries of Consol known as Bishop Coal Company and Itman Coal Company have been merged into Consol with Consol as the successor thereto. Consol is a wholly owned subsidiary of CONSOL Energy, Inc.

5. At various times between approximately 1974 and 1983, Consol and/or its predecessors Bishop Coal Company and Itman Coal Company arranged with Ward for transformers owned and used by Consol and/or its predecessors to be shipped to the Ward Site for repair and/or rebuilding and then returned to Consol and/or its predecessors for their continued use. In addition, Consol sold several of its used transformers to Ward, which

transformers were initially stored at the Ward Site and were subsequently repaired, rebuilt and/or reconditioned by Ward and then sold to third parties.

6. Each of the transformers that Consol and/or its predecessors sent to the Ward Site for service work, repair, rebuilding and/or were sold to Ward contained a mineral oil dielectric fluid which typically included some concentration of polychlorinated biphenyls ("PCBs").

7. Bassett is a Virginia corporation with its principal place of business at 3525 Fairystone Park Highway, Bassett, Virginia 24055.

8. Bassett arranged with Ward to have transformers owned by Bassett delivered to the Ward Site where they were repaired and then returned to Bassett. Bassett has assigned to Consol all its cost recovery and contribution rights under 42 U.S.C. §§ 9607(a) and 9613(f) related to the removal action at the Ward Site.

9. Effective September 16, 2005, Consol, Bassett, Carolina Power & Light, Inc. d/b/a Progress Energy Carolinas, Inc. ("CP&L"), Ward, certain Ward related entities, and EPA entered into an Administrative Settlement Agreement and Order on Consent ("Settlement Agreement") to provide for the performance of a time critical removal action pursuant to §§ 104, 106(a), 107 and 122 of CERCLA, 42 U.S.C. §§ 9604, 9606(a), 9607 and 9622, at the Ward Site and providing for the reimbursement to EPA for certain response costs incurred and to be incurred by EPA with regard to the Ward Site. In March 2007, PCS Phosphate Company Inc. ("PCS") agreed to participate with Consol, Bassett, and CP&L (collectively the "Performing Parties") in performing the work required by the Settlement Agreement.

10. Since September 16, 2005, the Performing Parties have reimbursed EPA at least $1,323,967.37 for response costs incurred by EPA, including site investigation and oversight costs, and the Performing Parties have directly incurred and paid at least an additional

$12 million in necessary response costs in performing the required removal action at the Ward Site. Consol and Bassett collectively have contributed at least $4.8 million to the payment of such costs. The Performing Parties, including Consol and Bassett, will continue to incur necessary response costs to complete the removal action as required by the Settlement Agreement and will continue to reimburse EPA's response costs in the future. It is currently estimated that the total removal action costs may exceed $60 million.

### Removal Action Non-Performing Parties

11. Upon information and belief, Ameren Corporation as successor-in-interest to Union Electric is a Missouri corporation with its principal place of business at One Ameren Plaza, 1901 Chouteau Avenue, St. Louis, Missouri 63103.

12. American Electric Corporation is a Florida corporation with its principal place of business at 523 S. Ellis Road, Jacksonville, FL 32205.

13. Town of Blackstone, Virginia is a municipal corporation with its principal place of business at 100 W. Elm Street, Blackstone, Virginia 23824.

14. Bonner Electric, Inc. is a Connecticut corporation with its principal place of business at 1865 Rt. #32, Uncasville, CT 06382.

15. Chevron Mining, Inc. as successor-in-interest to Pittsburg & Midway Coal Mining Co., is a Missouri corporation with its principal place of business at 1600 Smith Street, Houston, TX 77002.

16. Upon information and belief, Owen Electric Steel Company of South Carolina, a South Carolina corporation; and/or SMI-Owen Steel Company, Inc., a South Carolina corporation; and/or SMI Steel d/b/a CMC Steel South Carolina, an Alabama corporation operating a steel plant in Cayce, South Carolina; and/or Commercial Metals Company is a

1347629 v 1                                      5
Case 5:08-cv-00463-FL   Document 1   Filed 09/15/08   Page 5 of 19

Delaware corporation with its principal place of business at 6565 N. Macarthur Blvd., Irving, TX 75039.

17.	Cohen and Green Salvage Company, Inc. is a North Carolina corporation with its principal place of business at 465 Glidden Street, Fayetteville, NC 28301.

18.	Cooper Industries, Inc. as successor-in-interest to ABEX Inc. is a corporation with its principal place of business at 600 Travis, Suite 5600, Houston, TX. 77002.

19.	Cotter Electric Company is a Michigan corporation with its principal place of business at 2187 Orchard Lake Road Suite 220, Sylvan Lake, MI 48320.

20.	City of Dover, Delaware is a municipal corporation with its principal place of business at 15 East Loockerman Street, Dover, DE 19903.

21.	Endicott Clay Products Company is a Nebraska corporation with its principal place of business at 57120 707th Road, Endicott, NE 68350.

22.	Hagerstown Light Department is a Maryland corporation with its principal place of business at City Hall, 1 East Franklin Street, Hagerstown, MD 21740.

23.	Huntsville Utilities is an Alabama corporation with its principal place of business at 112 Spragins Street, Huntsville, AL 35801.

24.	Jet Electric Motor Company is a Rhode Island corporation with its principal place of business at 688 School Street, Pawtucket, RI 02862.

25.	Upon information and belief, Kelly Generator & Equipment, Inc. and/or Kelly Electrical Construction, Inc., and/or John E. Kelly & Sons Electrical Construction, Inc., is a Maryland corporation with its principal place of business at 1955 Dale Lane, Owings, MD 20736.

26. Lafarge Mid-Atlantic, Inc. and/or Lafarge Mid-Atlantic, LLC as successor to Genstar Stone Products Company and Redland Genstar Inc. is a Maryland corporation with its principal place of business at 12950 Worldgate Drive, Suite 500, Herndon, VA 20170.

27. Lewis Electric Supply Co., Inc. is an Alabama corporation with its principal place of business at 1306 2nd Street, Muscle Shoals, AL 35661.

28. City of Mascoutah, Illinois, is a municipal corporation with its principal place of business at 3 West Main Street, Mascoutah, IL 62258.

29. M-P Electrical Contractors, Inc. is a New Jersey corporation with its principal place of business at 51 New Brunswick Avenue, Perth Amboy, NJ 08861.

30. New Southern of Rocky Mount, Inc. is a North Carolina corporation with its principal place of business at 600 Wilkinson Street, Rocky Mount, NC.

31. The North Carolina Department of Agriculture and Consumer Services is a state agency with its principal place of business at 2 West Edenton Street, Raleigh, NC 27601.

32. P.C. Campana, Inc. is an Ohio corporation with its principal place of business at 1374 East 28th Street, Lorain, OH 44055-1689.

33. Phoenix Solutions Company as successor in interest to Plasma Energy Company is a Minnesota corporation with its principal place of business at 3324 Winpark Drive, Crystal, MN 55427.

34. Surry-Yadkin Electric Membership Corporation is a North Carolina corporation with its principal place of business at 510 South Main Street, Dobson, NC 27017.

35. Upon information and belief, Tennessee Associated Electric and/or Tennessee Associated Electric Holdings, Inc. is a Tennessee corporation with its principal place of business at 312 West Jackson Avenue, Knoxville, TN 37902.

36. Upon information and belief, Ventech Engineers, Inc., and/or Ventech Process Equipment, Inc. and/or Ventech Equipment Inc. and/or the Ventech Companies is a Texas corporation with its principal place of business at 1149 Ellsworth Drive, Pasadena, TX 77506.

37. Upon information and belief, Veolia Environmental Services Waste-to-Energy f/k/a Montenay Power Corporation is a Florida corporation with its principal place of business at 6990 NW 97th Avenue, Unit 5, Miami, FL 33178.

38. W.R. Schofield Construction Co. is a Massachusetts corporation with its principal place of business at 197 Main Street, North Reading, MA 01864.

39. Wheelabrator Technologies, Inc. is a Delaware corporation with its principal place of business at 1001 Fannin - Suite 4000, Houston, TX 77002.

**Factual Background**

40. Beginning in approximately 1964, the Ward Site, consisting of approximately 11 acres, was developed for use as a transformer repair, reconditioning, rebuilding, manufacturing and sales facility. From approximately 1965 through 2006, that facility was used for those purposes, first by Ward Transformer Company, Inc. and later by Ward Transformer Sales and Service, Inc. For some part of that time, the parcel now owned by Reward Properties, LLC was also used for Ward operations.

41. In addition to the properties described in paragraphs 1 and 40 *supra* and referred to herein as the Ward Site, EPA has identified as operable unit one ("OU1") at the Ward Superfund Site, the sediments in the surface water drainage basin downgradient from the Ward Site. This area, which includes unnamed tributaries to Little Brier Creek, Little Brier Creek, Brier Creek Reservoir, Brier Creek and Lake Crabtree, encompasses an area approximately four (4) miles long. EPA has indicated that it will seek to have additional remedial actions taken

to address PCB contamination in the sediments in the area referred to as OU1 at the Ward Superfund Site. OU1 is not the subject of this action.

42. In addition to the current removal action work at the Ward Site, EPA has indicated that additional work at the Ward Site will be required, including but not necessarily limited to a groundwater investigation, a risk assessment, a feasibility study and any remedial actions then determined to be necessary. EPA refers to this work at the Ward Site as operable unit two ("OU2"). OU2 is not the subject of this action.

43. The transformer service/repair/rebuilding facility at the Ward-owned property included a building with offices; a high bay area that was used for servicing, repairing, rebuilding, reconditioning and/or manufacturing transformers, switchgear and similar types of electrical equipment; an outside area where transformers, debris, scrap metal, drummed liquids, and other materials were stored on paved surfaces and on the ground; aboveground storage tanks for the storage of used and new transformer oils, also known as dielectric fluids; an area used for filtering used dielectric fluids; an "incinerator" used to burn off the dielectric fluid saturated paper insulation on transformer coils; a stormwater lagoon or holding pond; and a stormwater treatment plant.

44. From approximately the early-1930s through 1977, a class of chemical substances known as PCBs were a component in certain dielectric fluids that were used in the manufacture and operation of certain types of transformers, as well as other electrical equipment such as capacitors and switchgear.

45. During its operations at the Ward Site, Ward serviced, repaired, rebuilt and/or reconditioned transformers owned by third parties and then returned such transformers to the same third parties. In addition, Ward did business with a number of persons and entities that

were looking to get rid of or dispose of unwanted, defective, leaking, damaged, obsolete and/or excess transformers containing PCBs, and/or who sought to arrange for the replacement, disposition, treatment and/or disposal of PCB-containing fluid in such transformers. Ward purchased or otherwise acquired from such third parties the unwanted, defective, used, obsolete, scrap, excess, leaking and/or damaged transformers. Ward then stored those transformers in the backyard at the Ward Site until Ward found a purchaser for the rebuilt or reconditioned transformer and Ward then serviced, repaired, rebuilt, or reconditioned a transformer held in storage. In some instances, Ward stored such transformers and then scrapped them. During some period of the Ward operations, Ward salvaged transformers to reclaim the copper and/or aluminum windings and the metal core. In some instances, Ward took component parts from transformers stored in the yard and used those parts in repairing or rebuilding other transformers. In most instances, in repairing, rebuilding or reconditioning its customers' transformers and/or before selling reconditioned and/or rebuilt transformers, Ward removed the PCB-contaminated dielectric fluid for disposal and replaced it with new dielectric fluid.

46. Over the period of Ward's operations at the Ward Site, Ward acquired, rebuilt and resold and/or repaired "PCB transformers," *i.e.,* transformers containing PCBs in the dielectric fluid with a concentration at or above 500 parts per million ("ppm") and potentially as high as 300,000 to 700,000 ppm PCBs, as well as "PCB-contaminated transformers," *i.e.,* transformers containing from 50 to 499 ppm PCBs in the dielectric fluid, and "non-PCB transformers," *i.e.,* transformer containing less than 50 ppm PCBs in the dielectric fluid. The terms "PCB transformer," "PCB-contaminated transformer," and "non-PCB transformer" are defined in the regulations promulgated by EPA in 40 CFR Part 761 to implement part of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601 *et seq*.

47.     During the course of its transformer servicing, repair, rebuilding, reconditioning, salvaging and scrapping operations at the Site, Ward removed transformer oils, at least in part, by pumping the oil into aboveground storage tanks or into 55 gallon drums or other containers for storage and subsequent treatment by filtration and/or for disposition.  Further, Ward removed the core and coil assemblies to which some PCB fluids still adhered and took the core and coil assemblies into the transformer building for rewinding or other rebuilding.  Transformers that were stored in the yard awaiting servicing, repair, rebuilding and/or reconditioning, and resale or scrapping typically contained dielectric fluid with various concentrations of PCBs.  At least during some period of Ward's operations, Ward power-washed all transformers upon receipt at the Site in order to clean the outside surfaces of the transformers, including the removal of any PCBs that adhered to those surfaces due to sweat leaks or other releases.  Power washing was done in the loading/receiving dock area, and the contaminated wash water was allowed to drain off the dock and across the ground surface toward a drainage ditch along the southern side of the property.

48.     As a result of the receipt, reconditioning, servicing, disassembly, salvaging, repair and rebuilding of transformers with PCB-containing dielectric fluids, the power washing of transformers, and the storage of transformers, PCBs were leaked, spilled or otherwise released onto the floor of the transformer repair area and then tracked outside and PCBs were otherwise released into the soil and surface waters at the Ward Site with the result that PCBs entered the environment at the Ward Site.

49.     TSCA was enacted in 1976, and except as specified in rules promulgated by EPA, as of January 1, 1978, no person was permitted to distribute in commerce PCBs other than in a totally enclosed manner.  15 U.S.C. § 2605(e)(2)(A).  By rule, effective July 2, 1979, materials

containing PCBs in concentrations equal to or greater than 50 ppm were subject to a number of restrictions and prohibitions relating to processing, use, and distribution in commerce. After promulgation of the TSCA regulations, owners/users of PCB transformers and PCB-contaminated transformers were subject to regulatory requirements not applicable to non-PCB transformers. In order to avoid the burdensome TSCA regulatory requirements applicable to PCB and PCB-contaminated transformers, many transformer owners opted to get rid of their PCB transformers and/or to convert PCB-contaminated transformers to non-PCB transformers.

50. After January 1, 1978, anyone, such as Ward, engaged in the repair and/or the buying and selling of PCB-contaminated transformers was required to have an exemption granted by EPA in order to engage in transactions where a used PCB or PCB-contaminated transformer was purchased and then sold in the same condition as received or where the dielectric fluid in the transformer was replaced with non-PCB fluid (<50 ppm) but the unit had not been reclassified to non-PCB status in accordance with 40 CFR § 761.30(a)(2)(v). Ward applied for such an exemption, but that application was denied in 1985.

51. During a 1978 EPA inspection of the Ward Site, EPA found approximately 7,500 gallons of PCB fluid (>500 ppm) stored in 55 gallon drums and in an above ground storage tank. In addition, 41 PCB transformers (>500 ppm) stored in the backyard at the Ward Site contained 12,850 gallons of PCB fluid.

52. Beginning in approximately 1980 or 1981, Ward determined that the market for used, rebuilt or reconditioned transformers was predominantly for non-PCB transformers, *i.e.,* containing less than 50 ppm PCBs. As a result, for essentially every transformer rebuilt or reconditioned and/or sold thereafter, Ward removed the dielectric fluid from such transformers and replaced it with "new" non-PCB (<50 ppm) dielectric fluid for the purpose of characterizing

such transformers as rebuilt non-PCB transformers. In the process of changing or replacing the dielectric fluids, PCBs were spilled, leaked or otherwise released into the environment at the Ward Site. In addition, Ward accumulated large volumes of dielectric fluids containing PCBs at various concentrations.

53. As of 1984, Ward had accumulated approximately 18,000 to 20,000 gallons of PCB-contaminated (greater than 50 ppm but less than 500 ppm) dielectric fluids that had been removed from PCB-contaminated transformers. Those fluids were stored on site awaiting treatment to reduce the PCB concentration and/or for disposal.

54. In December 1983, Ward contracted for the disposal of 1,815 gallons of PCB (>500 ppm) dielectric fluid removed from transformers. In addition, between 1984 and 2004, Ward disposed of 48,085 gallons of PCB fluid removed from transformers, 86,069 gallons of PCB-contaminated fluid removed from transformers, and 485,778 gallons of non-PCB (less than 50 ppm PCBs) fluids removed from transformers.

55. During Ward's operations at the Site, numerous persons and entities, including those identified as non-Performing parties in paragraphs 11 through 39 *supra,* sent or arranged to send defective, leaking, damaged, used, obsolete, and/or excess transformers containing PCBs to the Ward Site which transformers were repaired, rebuilt, reconditioned, salvaged or scrapped resulting in PCBs being released and disposed of at the Ward Site.

56. On April 30, 2003, based upon the various site assessments described in the Settlement Agreement and the recommendation of the North Carolina Department of Environment and Natural Resources ("NCDENR"), the Ward Site was officially added to the CERCLA National Priorities List ("NPL"). Also, in April 2003, EPA began collecting samples as part of a remedial investigation ("RI") conducted at the Ward Site.

57. In September 2004, EPA issued an RI Report which indicated PCB contamination in the surface and subsurface soils at the Ward property and at the adjacent parcels. PCB-contaminated soils were also found in areas outside of the Ward property leading to the unnamed tributary to Little Briar Creek. PCBs were found in sediment samples and fish samples collected from the unnamed tributary, Little Briar Creek, Briar Creek Reservoir, Briar Creek and Lake Crabtree (*i.e.,* the area identified as OU1).

58. The Agency for Toxic Substances and Disease Registry ("ATSDR") issued a Public Health Assessment for the Ward Site finding that exposure of Ward employees to high PCB concentrations in surface soils could contribute to an increased risk of cancer. In addition, high PCB levels in the soil at the Ward Site continued to be a likely source of PCB contamination to sediments and fish in the unnamed tributary, Little Briar Creek, Briar Creek Reservoir, Briar Creek and Lake Crabtree. ATSDR concluded that consumption of PCB-contaminated fish from those water bodies could result in increased risks of cancer, as well as non-cancer health effects. The State of North Carolina Department of Health and Human Services issued fish consumption advisories for these areas, and EPA posted signs warning of the danger of consuming fish from these areas.

59. An August 9, 2004, EPA inspection of the Ward Facility found that surface water runoff from PCB-contaminated areas of the Ward Site—particularly the western portion of the property, where transformers, construction debris and scrap metal were stored—was not completely controlled, allowing surface water runoff to the unnamed tributary and beyond. The inspection also found surface water discharges from PCB contaminated areas into a drainage ditch along Mount Herman Road. In addition, EPA found that PCB contaminated sediments (up

to 2,900 ppm) in the Ward Site surface water lagoon could pose a threat of a release to the unnamed tributary depending on the integrity of the lagoon structure.

60. On August 9, 2004, EPA conducted a removal site assessment of the Ward Site and determined that a current unacceptable risk existed at the Site necessitating a time-critical removal action. On September 14, 2004, EPA signed an Action Memorandum/Enforcement which set forth EPA's determination to implement a time critical removal action at the Ward Site.

61. In October 2004, EPA sent notice/demand letters to the Performing Parties (except for PCS) and a number of other CERCLA potentially responsible parties ("PRPs"), notifying them of their potential liability and providing them with the opportunity to agree to conduct/finance the time critical removal action at the Ward Site and to reimburse EPA for its response costs.

62. During a January 2005 TSCA inspection of the Ward Site, EPA discovered 38 transformer casings containing an earthen material that Ward had used as a filter media. Testing of the earthen material indicated PCB concentrations as high as 143,000 ppm.

63. In September 2005, EPA, the Performing Parties (other than PCS), and certain Ward entities entered into the Settlement Agreement which requires the signatories to conduct the removal action work at the Ward Site and to reimburse EPA for its past and future response costs. In entering into the Settlement Agreement, EPA determined that the removal action required thereby is necessary to protect public health, welfare or the environment. If carried out in compliance with the terms of the Settlement Agreement, the removal action will be consistent with the National Contingency Plan ("NCP"), as provided in 40 CFR § 300.700(c)(3)(ii).

64. The Ward Site is a "facility" as defined in CERCLA § 101(9), 42 U.S.C. § 9601(9).

65. PCBs are "hazardous substances" as defined in CERCLA § 101(14), 42 U.S.C. § 9601(14).

66. Each non-Performing Party identified in paragraphs 11 through 39 *supra* is a "person" as defined in CERCLA § 101(21), 42 U.S.C. 9601(21).

67. There have been "releases" and "threatened releases," as defined in CERCLA § 101(22), 42 U.S.C. § 9601(22), of hazardous substances, *i.e.,* PCBs and other hazardous substances such as chlorinated benzenes, into the environment, at and from the Ward Site.

68. The releases of hazardous substances into the environment at and from the Ward Site have caused and will continue to cause EPA and the Performing Parties to incur necessary response costs in conducting the removal action at the Ward Site and in otherwise satisfying the requirements of the Settlement Agreement.

69. Each defendant non-Performing Party, by sending PCBs to the Ward Site for disposition, replacement, treatment and/or disposal, is a person who by contract, agreement or otherwise arranged for the disposal or treatment of hazardous substances owned or possessed by such persons at a facility owned by another party, and, as such, pursuant to CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), each such defendant is a CERCLA liable party.

## Count I

70. Repeats and realleges each and every allegation contained in paragraphs 1 through 69 hereof.

71. As provided in CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), persons who are liable under § 107(a)(3) are jointly and severally liable for any other necessary costs of response incurred by any other person consistent with the NCP.

72. In conducting the removal action at the Ward Site, as required by the Settlement Agreement, Consol and the other Performing Parties have incurred and are continuing to incur necessary costs of response and such costs have been and are being incurred consistent with the NCP.

73. As a result, each of the Non-Performing Party defendants are jointly and severally liable to Consol, individually and as the owner of Bassett's contribution rights, for all of the response costs incurred and to be incurred in performing the required removal action, together with prejudgment interest as provided in CERCLA § 107(a)(4).

74. To the extent that a judgment is entered in this action prior to the completion of the required removal action, Consol, individually and as the owner of Bassett's contribution rights, pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201, is entitled to the entry of a declaratory judgment as to each non-Performing Party defendant's liability for response costs that will be binding on said defendants in any subsequent actions to recover further response costs for the Ward Site.

## Count II

75. Repeats and realleges each and every allegation contained in paragraphs 1 through 74 hereof.

76. Consol and Bassett are parties that have resolved their liability to the United States for some or all of the response actions and some or all of the costs of such action in an administrative settlement. See ¶ 69.b of the Settlement Agreement attached hereto as Exhibit A.

77. As such, pursuant to CERCLA § 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B), Consol, individually and as the owner of Bassett's contribution rights, is entitled to contribution from any other liable party and each of the defendants is liable for its respective equitable share of the total amount of response costs incurred and paid by Consol.

WHEREFORE, Consol respectfully requests that the Court enter judgment as follows:

1. As to Count I, finding that each of the non-Performing Party defendants is jointly and severally liable to Consol for the full amount of the response costs incurred by Consol and Bassett in conducting the required removal action at the Ward Site; and

2. As to Count I, entering a declaratory judgment finding that each Non-Performing Party defendant is jointly and severally liable for any future necessary response costs incurred by Consol and Bassett at the Ward Site; and

3. As to Count II, finding that each non-Performing Party defendant is liable to Consol for its equitable share of the total amount of the response costs incurred and paid by the United State and reimbursed to the United States by Consol and Bassett; or

4. As to Count II, finding that each non-Performing Party defendant is liable to Consol for its equitable share of the total amount of response costs incurred by Consol and Bassett in conducting the required removal action at the Ward Site plus the total amount of the United States' response costs that have been reimbursed by Consol and Bassett; and

5. Prejudgment interest as provided in CERCLA § 107(a)(4); and

6. Granting such other further relief as the Court deems just and proper, including Consol's costs and disbursements in this action.

Respectfully submitted this the 15th day of September, 2008.

/s/ William W. Pollock
WILLIAM W. POLLOCK
N.C. Bar No.: 19381
Attorneys for Plaintiff
CRANFILL SUMNER & HARTZOG LLP
Post Office Box 27808
Raleigh, NC 27611-7808
Telephone: (919) 828-5100
Facsimile: (919) 828-2277
Email: wpollock@cshlaw.com

/s/ Daniel M. Darragh
DANIEL M. DARRAGH
Pennsylvania Bar No.: 34076
Attorneys for Plaintiff
COHEN & GRIGSBY, P.C.
625 Liberty Avenue
Pittsburgh, PA 15222-3152
Telephone: (412) 297-4718
Facsimile: (412) 209-1940
Email: ddarragh@cohenlaw.com