IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| CAROLINA POWER & LIGHT COMPANY d/b/a PROGRESS ENERGY CAROLINAS, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | NO. 5:08-CV-460-FL |
| ALCAN ALUMINUM CORPORATION, et al., | ) ) ) ) | |
| Defendants. | ) | |
| | | |
| CONSOLIDATION COAL COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | NO. 5:08-CV-463-FL |
| v. | ) ) | |
| ALCAN ALUMINUM CORPORATION, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER**

This matter comes before the court on: (1) defendant Georgia Power Company's ("Georgia Power") motion for summary judgment (DE # 882)[1]; (2) plaintiff Carolina Power & Light Company's ("CP&L") cross motion for partial summary judgment (DE # 885); and (3) plaintiff

---

[1] Note that for the convenience of the court, all docket entry numbers in this order are based upon their location in the CP&L docket, 5:08-cv-460.

Consolidation Coal Company's ("Consol") and claimant PCS Phosphate Company's ("PCS Phosphate") cross motion for partial summary judgment (DE # 941). As they relate to these summary judgment motions, the court also will address in this order: (1) defendant Georgia Power's motion to strike affidavit (DE # 1024); and (2) plaintiffs' joint motion to exclude (DE # 1061). The issues raised are ripe for adjudication. For reasons set forth below, defendant Georgia Power's motion for summary judgment is GRANTED, plaintiffs' motions for summary judgment are DENIED and the related motions are DENIED as moot.

## STATEMENT OF THE CASE

The court's orders dated March 24, 2010, and March 30, 2012, contained a detailed statement of the case, which section the court incorporates here. For ease of reference, the court repeats and updates much of that summary below.

Plaintiffs CP&L and Consol entered into an administrative settlement with the United States Environmental Protection Agency ("EPA") in 2005, which obligates them to perform removal actions at the Ward Transformer Superfund Site ("Ward Site") and to reimburse the EPA for its own removal costs related to the site, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-9675. Cross-claimant PCS Phosphate, though not a party to the administrative settlement, entered into a trust agreement with plaintiffs and has contributed to funding the removal action.

On September 1, 2009, plaintiffs filed their consolidated amended complaints against all defendants.[2] Plaintiffs seek contribution toward the costs of removal actions at the Ward Site,

---

[2] Originally, six separate lawsuits were filed by plaintiffs CP&L and Consol between September 12, 2008, and April 30, 2009. They were consolidated into the two lead cases noted above at a joint scheduling conference, on August 18, 2009. On September 1, 2009, CP&L's consolidated and second amended complaint and Consol's second amended complaint,

pursuant to § 113(f) of CERCLA.[3] On September 15, 2009, PCS Phosphate counterclaimed against plaintiffs and cross-claimed against other defendants seeking cost recovery based on their contribution to the removal action, pursuant to § 107(a) of CERCLA. See 42 U.S.C. § 9607(a).

Claimants allege that defendants sent electrical transformers to the Ward Site. These transformers allegedly contained dielectric fluids that were used as an insulating and cooling medium. In turn, the dielectric fluid allegedly contained polychlorinated biphenyls ("PCBs"). Claimants identify three groups of defendants: (1) those who sent transformers to the Ward Site for repairs and for the purpose of disposing of PCBs contained therein or some part thereof; (2) those who sent transformers to the Ward Site on consignment and for the purpose of disposing of the transformers and/or PCBs contained therein or some portion thereof; and (3) those who sold transformers to Ward with the intent to dispose of such transformers and/or the PCBs contained therein or some portion thereof. Claimants maintain that the repair and consignment defendants are liable under CERCLA §§ 107(a)(2) and (3), while the sale defendants are liable only under § 107(a)(3).[4]

---

each alleged liability against approximately one hundred and forty-four (144) defendants. Thereafter, the court issued a preliminary case management order, setting forth the phases of discovery (Phase I: Liability and Phase II: Allocation of Costs) and ordering a future discovery status conference. As Phase I discovery progressed, on July 23, 2010, plaintiff CP&L filed a consolidated and third amended complaint. For clarification, as defendants continued to be voluntarily dismissed and some were dismissed by order (DE # 277), plaintiffs filed a list of defendants remaining in the case by transaction on November 18, 2011, indicating that one hundred and twelve (112) defendants remained (DE# 630). The court is aware that there are outstanding defendants according to their complaints that are not listed on the November 18, 2011, notice. The list is not binding on the parties, and the court reminds the parties that notice must be filed in accordance with the local rules when any defendant settles or is otherwise dismissed by plaintiffs, particularly with respect to defendants American Skiing Company and Phoenix Solutions Company.

[3] Plaintiffs CP&L and Consol originally sought recovery of and/or contribution toward these costs under §§ 107(a) and 113(f) of CERCLA. However, by order entered March 24, 2010, and September 8, 2010, plaintiffs' § 107(a) cost recovery claims were dismissed.

[4] Section 107(a)(2) makes liable "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). Section 107(a)(3) makes liable "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or

3

On October 13, 2009, defendants moved to dismiss the amended complaints and cross-claims. Defendants filed a single omnibus motion pursuant to Rule 12(b)(6) for failure to state a claim for relief, which motion was supplemented by individual defendants or groups of defendants filing additional motions to dismiss on alternative grounds where appropriate. By order entered March 24, 2010, the court denied defendants' omnibus motion to dismiss. Claimants were allowed to proceed on their past owner liability and arranger liability claims. However, the court granted certain defendants' motion to dismiss plaintiffs' § 107(a) cost recovery claims, finding that response costs incurred pursuant to an administrative settlement with the United States are recoverable only under § 113(f).[5] Subsequently, the court ruled on several motions to dismiss particular to individual defendants.

During a status conference with parties' counsel on October 5, 2011, the parties suggested using a test case method to help expedite the discovery process. Magistrate Judge Daniel entered an order memorializing the conference on October 7, 2011, and this court further clarified scheduling issues with regard to test case defendants on November 14, 2011. That order allowed a continuance of Phase I discovery, and laid out motion filing deadlines for the test case to proceed.[6] All parties were given the opportunity to object to the use of test case defendants or scheduling changes. On

---

arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3).

[5] The parties subsequently stipulated, in consent order dated September 8, 2010, that plaintiffs' § 107(a) cost recovery claims as to the remaining defendants were also dismissed (although cross-claimant PCS Phosphate's § 107(a) cost recovery claims were unaffected).

[6] Note that in said order, there were originally three test case defendants: Georgia Power, Broad River Electric Cooperative, Inc. ("Broad River") and Bonner Electric, Inc. ("Bonner Electric"). Bonner Electric subsequently settled, leaving no test defendant in the category of consignments. As discussed below, Georgia Power is the test case defendant in the category of sales. An order addressing Broad River's liability, as the test case defendant in the repairs category, will follow.

4

November 29, 2011, and upon consideration of such objections, this court amended its order and decided to stay discovery for all other defendants pending the resolution of the test case defendants' motions (DE # 651).[7]

This order addresses only the liability of defendant Georgia Power (the sales test case defendant).[8] On January 30, 2012, Georgia Power moved for summary judgment and requested a hearing, which plaintiffs opposed and Georgia Power replied. Plaintiffs then filed cross-motions for partial summary judgment on the liability of Georgia Power, which Georgia Power opposed and plaintiffs replied.

## STATEMENT OF THE FACTS

A.  Ward Site

Since 2004, the Ward Site, which comprises a number of acres near Mt. Herman Road and the Raleigh-Durham International Airport in Wake County, North Carolina, has been subject to a time-critical removal action, as determined by the EPA, for environmental contamination caused by polychlorinated biphenyls ("PCBs"). Pls.' Joint SOF ¶¶ 4, 14. The Site includes a former transformer repair, sales, and reconditioning facility ("the Ward Facility") on eleven (11) acres of land, as well as other adjacent parcels of land.[9] Id. at ¶¶ 14, 17-19, 23. The PCB contamination may

---

[7]Also, in the midst of deciding how to proceed with test case scheduling, PCS Phosphate filed three third party complaints (DE ## 633, 634, 635), which some defendants responded to with numerous of motions to extend time to file an answer where parties were attempting to comply with discovery orders. Currently pending on the docket are eleven (11) related motions to dismiss and motion for leave to file surreply, which will be addressed by separate order.

[8]Defendants Georgia Power and Broad River made a joint motion to extend time to conduct expert discovery on January 3, 2012, and supplemented that motion on January 9, 2012, which plaintiffs responded in opposition on January 10, 2012. This court denied such motion by order for failure to show good cause and prejudice to the plaintiffs on January 12, 2012.

[9] "The function and purpose of a transformer is to change an electrical current, typically by lowering or 'stepping down' the voltage. Transformers are composed of 'coils' or 'windings' made of copper or aluminum wire wrapped around an iron core. The core and coil are housed inside a steel tank and submerged under a dielectric fluid ('oil') to cool, insulate,

be traced back directly to the Ward Facility, where Ward Transformer Company, Inc. and its successor in business operations Ward Transformer and Sales, Inc. (collectively "Ward") worked on and stored transformers contaminated with PCBs. Id. at ¶¶ 39-49.[10]

B.  Georgia Power

Georgia Power is a Georgia corporation with its principal place of business in Atlanta. It is an electric utility company, which uses electrical transformers to generate, transmit, distribute and sell electricity to meet approximately 97% of Georgia's power needs. Pls.' Joint SOF ¶ 50. When Georgia Power's transformers fell into disrepair, it used its own repair facility, Forest Park, to inspect the transformers and either repair or dispose of them. Id. at ¶¶ 52-54. Transformers that Georgia Power did not wish to use any longer, but still believed had some value, were transferred to its Salvage Department (a.k.a. Investment Recovery) and sold. Id. at ¶¶ 60-61. Before sale, Georgia Power usually removed the oil from transformers by pumping them twice. Id. at ¶ 70.

Removing oil from a transformer through this double pumping method leaves a sheen or residue of oil in the transformer. Therefore, draining the oil from a transformer does not completely remove all oil. For the purposes of this order, any Georgia Power transformer referred to as having no oil or having been drained is recognized to contain some residual quantity of oil. The double pumping method Georgia Power used to remove oil would leave the inside of the transformer, and its core and coil, coated in a "sheen" of oil, but did not leave any free-flowing oil in the

---

and protect the electrical components. . . . Transformers also often have radiators or bushings attached to the outside of the tank." (CP&L Amend. Compl. ¶ 7.)

[10] Note that defendant Georgia Power disputes this evidence as general and not providing a specific time frame. Def. Georgia Power's Resp. to Pls.' SOF ¶¶ 39-49. The court is providing this information on Ward's general state of contamination for background purposes, as Georgia Power's transactions with Ward are specifically discussed in the following section. See infra Part B.

6

transformer.[11] See Brown Dep. 16-17, 27-28, 31, 47-48, 51, 81-82.

Ward obtained transformers from Georgia Power in 1983 and 1984, through several auctions, where Georgia Power sold hundreds of its used transformers, guaranteeing only title. Pls.' Joint SOF ¶¶ 92-111. Ward then repaired or remanufactured the transformers for which it had a winning bid.[12] All of the transformers that Georgia Power sold to Ward were resold to third parties and, where records are available, the transformers were sold for more money than the purchase price from Georgia Power.[13] Georgia Power's SUMF, Ex. B; Pls.' Joint Resp. ¶ 89.

As an ancillary matter, Georgia Power merged with its sister company, Savannah Electric and Power Company ("SEPCo") in 2006. Pls.' Joint Resp. ¶ 125. In 1980, when it was still a separate entity, SEPCo sold twenty transformers to Electric Equipment Company of New York ("EEC"), a business partner to Ward. Id. at ¶ 132. Those transformers were shipped to Ward for storage. Id. Therefore, the alleged liability of Georgia Power includes these twenty transformers sold by SEPCo, as they are now merged. Each separate transaction between Georgia Power and Ward, along with the SEPCo transaction, is described in more detail below.

---

[11] The only evidence that a measurable amount of free-flowing oil is left in transformers presented by plaintiffs goes to the general assertion that residual oil remains in transformers after drainage, as illustrated through demonstrative examples, but does not establish that any free-flowing oil actually remained in any drained transformers at the time they were sold by Georgia Power, for several reasons. See Brewer Dep., Ex. 38g. The drained transformers that Georgia Power sold to Ward were padmount transformers that were drained using a double pumping method. See Brown Dep. 16-17, 27-28, 31, 47-48, 51, 81-82; infra sections 1-4. Plaintiffs' evidence consists of testimony of Ward employees about how all types of transformers were drained there and the residual oil that resulted, and not on the double pumping method used by Georgia Power. See Brewer Dep. 21-210 and corresponding exhibits. In any event, even if there was some free-flowing oil in the drained Georgia Power transformers, this does not change the court's analysis on summary judgment. See infra fn. 18.

[12] Note that upon inspection, Ward returned some transformers to Georgia Power instead of purchasing them. See infra section 3.

[13] Plaintiffs dispute the terminology "resold" where many transformers were rebuilt or remanufactured before sale. The court recognizes that the transformers were not sold in the same condition as they were purchased, and uses the term "resold" in a broad manner for the purposes of this order.

7

1. September 1983 Sales Transaction

On September 1, 1983, Ward purchased 43 padmount transformers, totaling 21,950 kilovolt-amperes ("KVAs"), from Georgia Power for a total purchase price of $45,962.00. Dennis Dep. Ex. 215, GPC-IronMtn-0037; Pls.' Joint Resp. to Georgia Power's SUMF ¶ 50. These transformers were sold in lots, which Georgia Power listed twelve (12) lots, Ward bid upon ten (10) lots, and won four lots as the highest bidder. Pls.' Joint Resp. ¶¶ 51-53; Dennis Dep. Ex. 215, GPC-IronMtn-0037. One of those lots consisted of ten (10) transformers that contained oil, and the remaining thirty-three (33) transformers were drained. Pls.' Joint Resp. ¶ 55; Dennis Dep. Ex. 215, GPC-IronMtn-0037. Of the oil-containing transformers, nine of them had PCB concentrations of between zero and fifty (50) ppm, and one had a PCB concentration of between fifty (50) and five hundred (500) ppm. Pls.' Joint Resp. ¶ 56; Georgia Power's Supp. Material Ex. G, Part 3, WL000456-. All forty-three (43) of the transformers that Ward purchased from Georgia Power in September 1983 were resold, most after repair, rebuilding or reconditioning.[14] Pls.' Joint Resp. ¶ 58; Brewer Dep. 470-71; Georgia Power's Supp. Material Ex. G, Part 4 (containing Ward Order Sheets or Packing Slips reflecting sales from Ward to third parties of these transformers).

2. March 1984 Sales Transaction

On March 19, 1984, Ward purchased twenty (20) used padmount transformers, totaling 18,450 KVAs, from Georgia Power for a total cost of $21,636.10. Dennis Dep. Ex. 216, GPC-IronMtn-0036; Pls.' Joint Resp. ¶ 59. Georgia Power listed four lots of transformers, and Ward bid

---

[14] Note that repair, reconditioning and rebuilding of transformers at Ward involved draining the oil, if any, from the transformers. Then the transformers may have different parts, including its gaskets, core and/or coil removed and replaced. The transformers would then be calibrated or adjusted to meet the voltage needs of prospective buyers, before being refilled with oil. This process inevitably resulted in leaks and spills of PCB-contaminated oil, which necessitated the CERCLA clean up costs at issue here. See, e.g., Pls.' Joint Resp. ¶¶ 3, 7, 9, 58, 66, 76, 84, 86-89, 105-106.

8

on all of them, winning only two lots as it was competing against other companies. Pls.' Joint Resp. ¶¶ 60-63. All twenty (20) transformers were drained of oil before they were physically transferred to Ward. Id. at ¶ 65. All of the transformers were resold, most after being rebuilt by Ward, to third parties. Id. at ¶ 66; Brewer Dep. 470-71; Georgia Power's Supp. Material Ex. H, Part 2 (containing Ward Order Sheets or Packing Slips reflecting sales from Ward to third parties of these transformers).

3.  April 1984 Sales Transaction

On April 10, 1984, Ward purchased eleven (11) used padmount transformers, a total of 17,550 KVAs, from Georgia Power for $20,173.55. Pls.' Joint Resp. ¶ 67. Georgia Power offered seven lots, (six of padmount transformers and one of overhead distribution transformers) for which Ward bid on three lots and won two, while competing against other companies. Id. at ¶¶ 68-71. According to Ward's records, those two lots totaled eighteen (18) transformers, but Ward only purchased and took possession of eleven (11) of them. Id. at ¶ 72. Ward records also indicated that either three or four of these transformers contained oil. Id. at ¶ 74; Georgia Power's Supp. Material Ex. I, Part 1, GPC-IronMtn-0031-32, and Part 2, WT005451. Those transformers with oil contained PCBs at levels of less than fifty (50) ppm. Pls.' Joint Resp. ¶ 75. All of the eleven (11) transformers purchased from Georgia Power in April 1984 were subsequently resold, after ten were rebuilt and one was repaired. Id. at ¶ 76, and Exs. A, D.

4.  October 1984 Sales Transaction

On October 25, 1984, Ward purchased twenty-seven (27) used padmount transformers, totaling 17,950 KVAs, from Georgia Power for $34,909.75. Pls.' Joint Resp. ¶ 77. Georgia Power had six lots of padmount transformers and one lot of power transformers up for bid, and Ward bid

9

on all six lots of padmount transformers, in competition against other companies. Id. at ¶¶ 78-80. Ward won four of the lots as highest bidder and purchased all twenty-seven (27) transformers, which contained no oil.[15] Id. at ¶¶ 81-83. All of these transformers were resold, most after being repaired, rebuilt or reconditioned, by Ward to third parties. Id. at ¶ 84, and Exs. A, B, D; Georgia Power's Supp. Material Ex. J, Parts 1, 3.

     5.     January 1980 Sales Transaction

SEPCo, an electric utility company based in Savannah, Georgia, utilized electrical transformers and, similar to Georgia Power, would sell its used transformers to the highest bidder in sales transactions. Pls.' Joint Resp. ¶¶ 90, 92-94. In January 1980, SEPCo sold twenty (20) substation transformers to EEC for $29,581.00, paid in three installments. Dennis Dep. 147-50; Tennille Dep. 46, Ex. 625; Pls.' Joint Resp. ¶ 98. With no direct evidence either way, it is possible that SEPCo knew the transformers would be sent to Ward for storage by EEC, although SEPCo did not sell any transformers to Ward or conduct any known business transactions with Ward. Pls.' Joint Resp. ¶¶ 103-104. The transformers all contained oil, with some level of PCB contamination.[16] Id. at ¶ 101. All twenty (20) of the SEPCo transformers were subsequently resold by Ward or EEC to third parties, after repairing, rebuilding or reconditioning some of them. Id. at ¶ 105. For the transformers where records of resale price are available, Ward resold the SEPCo transformers for

---

[15] Note that for one of these transformers, plaintiffs contend that four years after the purchase, an inventory card indicated the transformer had about five gallons of oil tested at 17.4 ppm PCBs, which Ward cannot account for according to its standard procedures. Id. at ¶ 83; Brewer Aff. 12, Ex. K. Based upon this inventory card, plaintiffs contend that the residual oil came from Georgia Power. This evidence is insufficient to show that single transformer contained free-flowing oil at the time of sale. However, to the extent that summary judgment requires the court to construe the facts in favor of the nonmoving party, it considers this possibility in its analysis below.

[16] Georgia Power contends that the PCB concentration levels were less than fifty (50) ppm, but plaintiffs contend that the PCB levels were higher. Pls.' Joint Resp. ¶ 101.

10

more money than it paid to obtain them. Id. at ¶ 106; Georgia Power's SUMF, Ex. D.

## DISCUSSION

A.  Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to find for the non-moving party). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

Summary judgment is not a vehicle for the court to weigh the evidence and determine the truth of the matter, but to determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. Accordingly, the court must examine the materiality and the genuineness of the alleged fact issues in ruling on this motion. Id. at 248-49.

11

B.  Evidentiary Matters

As a preliminary matter, the court considers first the disputes raised by Georgia Power's motion to strike affidavit of Brewer and Canady, filed March 16, 2012, and plaintiffs' joint motion to exclude affidavit of Richard Westover and related deposition testimony, filed April 6, 2012. The court denies these motions as moot, as the court does not need to rely on these particular affidavits in order to rule on summary judgment in this case. Even if plaintiffs' motion was granted, and Georgia Power's motion was denied, the court would still reach the same result: denying plaintiffs' motions for summary judgment and granting defendant Georgia Power's motion for summary judgment.

C.  Arranger Liability

Georgia Power contests its arranger liability under CERCLA, claiming lack of intent to dispose of any hazardous substance at the Ward Site (Mem. in Supp. of Def.'s Mot. for Summ. J. 5). In order to establish a prima facie case of arranger liability under 42 U.S.C. § 9607, a plaintiff must show: (1) that the defendants owned or possessed hazardous substances; (2) that they, by contract, agreement or otherwise, arranged for disposal or treatment, or arranged for transport for disposal or treatment of those substances at a facility; (3) that there was a release or threatened release of a hazardous substance at the site; and (4) that the release or threatened release caused the incurrence of response costs. United States v. Ward, 618 F. Supp. 884, 893-94 (E.D.N.C. 1985).

As to the second element above: "An entity may qualify as an arranger under [42 U.S.C.] § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." Burlington N. & Sante Fe Ry. Co. v. United States, 556 U.S. 599, 610 (2009). The determination of intent for the purposes arranger liability is "fact intensive and case specific," where several factors may be

12

considered by the court. Id. Knowledge of disposal is one such factor, see Burlington N., 556 U.S. at 612, and others include "the value of the materials sold, the usefulness of the materials in the condition in which they were sold, and the state of the product at the time of transferral . . . ." Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R. Co., 142 F.3d 769, 775 (4th Cir. 1998).

In Pneumo Abex, plaintiff sued for contribution for the costs of cleaning up a railroad parts foundry that was designated as a Superfund Site by the EPA. Pneumo Abex Corp., 142 F.3d at 772-73. Defendants in that case sold used journal bearings to the foundry for processing into new bearings. Id. at 772. Used bearings were coated in dirt and grease, and made of lead and brass. Id. at 772-73. The sellers would ship in old bearings, then receive a credit toward the purchase of new bearings. Id. at 773. The sales price or credit was calculated according to the weight of the bearings, subtracting the weight of dirt and grease. Id. The foundry would heat the used bearings to clean off impurities, and separate the lead from the brass parts. Id. This process released heavy metals onto the foundry site that were later determined to be hazardous substances requiring remediation. Id. Plaintiff alleged arranger liability against the sellers under CERCLA on summary judgment. Id. at 774. The court held that defendant could not be held liable for arranging disposal because the transaction involved the sale of a useful product. Id. at 775-76.

In so holding, the court reasoned that several factors are relevant to determining if "a transaction was for the discard of hazardous substances or for the sale of valuable materials . . . ." Id. at 775. The court recognized that the used bearings were "dirty and broken when they arrived," and had to be "melted down in a process which produced both dust and slag . . . ." Id. However, it found that the *purpose* of the transaction was not to remove contaminants, although that removal was

13

incidental to remolding new bearings. Id. The court also noted that the foundry paid a competitive price for the bearings themselves, showing that the "parties contemplated that the bearings were a valuable product . . . ." Id. at 775-76.

In Burlington Northern, the Supreme Court stated that the disposal of hazardous waste must be specifically planned for it to be arranged. 556 U.S. at 611-12. The Court laid out a spectrum to illustrate the limits of arranger liability under CERCLA. Id. at 609-10. In particular, the court stated:

> It is plain from the language of the statute that CERCLA liability would attach under § 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance. It is similarly clear that an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination.

Id. at 609-10.

In Burlington Northern, Shell Oil Company sold pesticides to an agricultural chemical distributor, B&B. Id. at 602-603. The pesticides were purchased in bulk, and spills occurred at several points of transfer, including when the product arrived at the site, and was distributed to storage tanks or trucks or rigs. Id. at 603-604. Shell was aware that spills occurred and tried to limit such incidents by providing safety manuals to its distributors, discounts for implementing safe practices, and even requiring inspections for compliance with the law. Id. at 604. B&B still operated in a manner that caused contamination of soil and groundwater, eventually leading to CERCLA liability. Id. at 605. The Supreme Court considered Shell's knowledge that pesticides leaked at the B&B site, but recognized that is just one factor to consider when determining the specific purpose of the sales transaction. Id. at 612. The spills and leaks of pesticides were something that Shell tried to avoid by implementing numerous safety precautions. Id. at 612-13. Even though these measures

14

were not "wholly successful," the Court held that Shell could not be subject to arranger liability under CERCLA, where the transactions amounted to sales of a useful product. Id. at 613.

Turning to the factors considered when making an arranger liability determination, this court looks first to the value of the materials sold. See Pneumo Abex Corp., 142 F.3d at 775. Here, the one hundred and one (101) Georgia Power transformers at issue were sold through auctions in 1983 and 1984. Pls.' Joint Response to Georgia Power's SUMF ¶¶ 41, 44. When Ward's bid won, it paid between approximately $150.00 and $3,200.00 per transformer (as calculated according to bids obtained on a pay per KVA basis). Id. at ¶¶ 25-27, 44-45. Ward was able to resell most or all of the transformers that it purchased from Georgia Power, after reconditioning and/or reconfiguration, making thousands of dollars more than what Ward paid Georgia Power, on resale.[17] Id. at ¶¶ 58, 66, 76, 84, 85. Ward's own business included the purchase, modification and resale of used electrical equipment. (Id. at ¶¶ 5-6.) Clearly, the transformers that Georgia Power sold to Ward had marketable value. Ward Dep. 223.

Another factor for the court to consider is the usefulness of the materials at the time they were sold. See Pneumo Abex Corp., 142 F.3d at 775. Notably, used transformers have been found by other courts to be useful materials. See, e.g., Florida Power & Light Co. v. Allis Chalmers Corp., 893 F.2d 1313, 1319 (9th Cir. 1990) (finding that forty year-old transformers with PCB-laden oil, sold as scrap at the end of their useful lives, were still a useful product and their sale to a salvage

---

[17] Note that plaintiffs contend that "resale" is not a proper term because the transformers were sometimes rebuilt, reconditioned or sold in parts. The court finds this distinction in terms immaterial to the case. The transformers were subsequently sold by Ward. Most, if not all, continued to be used as transformers by those buyers after the repairs and reconditioning that Ward performed. As in Pneumo Abex, the complete dismantling and remaking of a product by the buyer does not necessarily mean that it was not bought for value, or that the seller was arranging for disposal under CERLCA. See 142 F.3d at 775 (considering usefulness of used ball bearings that had to be melted down and reformed into new ones).

15

company was not an arrangement for disposal of hazardous waste); Schiavone v. Northeast Utilities Service Co., No. 3:08CV429(AWT), 2011 WL 1106228, at *5-6 (D. Conn. Mar. 22, 2011) (finding that sales of used transformers for scrap metal, which were dismantled and resold, was not an arrangement for disposal of the transformer oil but to dispose of the transformers themselves, creating no liability under CERCLA). In this case, the transformers were not even used for scrap metal, but all or most continued to be used as transformers after their sale because they had not reached the end of their useful lives. Plaintiffs argue that the court should place emphasis on the fact that some of the transformers had to be remanufactured, which included removing defective parts. Pl.'s Mem. in Supp. 16. The court finds this argument unpersuasive where precedent shows that items sold as scrap to be melted down and remade were useful at the time of sale. See Pneumo Abex Corp., 142 F.3d at 775.

The "state" of the product at the time of sale focuses on whether the hazardous material at issue was contained or leaking. Pneumo Abex Corp., 142 F.3d at 775. Here, none of the transformers filled with oil were leaking at the time of sale, because they were capped. Many of them were drained of oil, except for a "film" or "sheen" of residual oil. Plaintiffs argue that the drained transformers which were not capped could have had moisture enter into them which would degrade the transformers. Pl.'s Mem. in Supp. 17. These allegations do not amount to leaking at the time of sale, as contemplated by Burlington Northern. 556 U.S. at 603-604 (describing the spills and leaks that took place during the transfer of pesticides that were shipped in bulk, liquid form and

transferred between several types of containers).[18] Nor does the fact that the drained transformers were not capped show that Georgia Power intended to dispose of hazardous waste. Instead, the fact that Georgia Power drained and disposed of PCB-laden oil before sale of those transformers shows that Georgia Power's purpose for these transactions was to sell transformers to Ward and not dispose of the oil containing hazardous waste.

Finally, the court evaluates whether the defendant Georgia Power had knowledge that hazardous waste would be "leaked, spilled, dumped or otherwise discarded" as a result of its transactions with Ward. See Burlington N. & Sante Fe Ry. Co., 556 U.S. at 612. "[K]nowledge alone is insufficient to prove that an entity 'planned for' the disposal . . . ." Id. In this case, where all other factors counsel toward a finding that Georgia Power lacked the requisite intent for arranger liability, the court will not rely on "knowledge alone" to hold defendant Georgia Power liable. Furthermore, the knowledge alleged by plaintiffs is merely about Georgia Power's general expertise in dealing with transformers and PCB-laden oils, and not any knowledge as to spills at Ward. Compare CP&L's Mem. in Supp. 16-17 (listing Georgia Power's general knowledge of transformer repair and that PCBs in transformer oil are toxic), with Burlington N. & Sante Fe Ry. Co., 556 U.S. at 612 (recognizing Shell's specific knowledge that *its product* would be spilled and leaked upon transfer). Therefore, Georgia Power has met its burden on summary judgment by showing it did not have the necessary intent to create arranger liability under CERCLA.

Plaintiffs rely on inapposite case law to assert that the circumstances in this case do show

---

[18]Even if the drained transformers were leaking some residual oil, for which the court finds inadequate support in the record, that would only be one factor for the court to consider in determining the intent of the parties to the sales transaction. See supra fn. 11. Here it is clear that the intent was to sell useful products, i.e., the transformers which indisputably contained some amount of PCBs, even assuming that the drained transformers leaked residual oil at the time of sale.

17

intent to arrange for disposal of hazardous waste. Consol's Mem. in Supp. of Cross Motion 12-15; CP&L's Mem. in Supp. 9-14. For example, Consol argues that two Sixth Circuit cases decided before Burlington Northern counsel toward finding arranger liability, or at least against granting summary judgment for Georgia Power. In GenCorp, Inc. v. Olin Corp., 390 F.3d 433 (6th Cir. 2004), the court recognized the relationship between a manufacturing plaint and a chemical supplier, where the plant was built with the suppliers assistance, was "a business relationship that defie[d] easy categorization." 390 F.3d at 437. The court found arranger liability of the chemical supplier in that case because of the close and unique relationship between the parties, including several contracts, a joint committee with members from both businesses which discussed disposal, evidence that the supplier's employees specifically researched and recommended waste disposal locations, and both corporations funded research on reducing waste to be disposed offsite. Id. at 446. Here, there is no evidence of the type of unique relationship the court examined in GenCorp, but merely a pure sales transaction where Georgia Power auctioned transformers over the course of two years, and Ward purchased them.

United States v. Cello-Foil Products, Inc., 100 F.3d 1227 (6th Cir. 1996), is similarly inapposite. That court found that there was a genuine issue of material fact as to the intent of the parties for the purpose of determining arranger liability, denying summary judgment. Id. at 1234. The Sixth Circuit relied heavily on the fact that defendants had knowledge of disposal. Id. at 1233. As discussed infra, Burlington Northern counsels against a heavy reliance on "knowledge alone." However, Cello-Foil is also factually distinguishable where the defendants were returning drums with some amount of unused solvents to a supplier for a deposit return on the drums. 100 F.3d at 1233-34. Here, Georgia Power did not return a mere container for a deposit, but sold transformers

18

at auction for a competitive price. Plaintiff CP&L further argues that Cello-Foil stands for the proposition that defendant Georgia Power did not have to have a specific purpose and intent to dispose of a hazardous substance. CP&L's Mem. in Supp. 8-9. While it may be true that arranger liability can be found on the basis of a contract with multiple purposes, one of which is to dispose, Burlington Northern made it clear that the arranger must have "planned for the disposal" and that disposal must be "a specific purpose" of the transaction, as evidenced by a party taking "intentional steps to dispose of a hazardous substance." Burlington Northern, 556 U.S. at 611-12 (citing Cello-Foil Prods., Inc., 100 F.3d at 1231). Therefore, Cello-Foil as interpreted by Burlington Northern does require specific intent to dispose for arranger liability under CERLCA.

Plaintiffs also rely on the more recent First Circuit case United States v. General Elec. Co., 670 F.3d 377 (1st Cir. 2012), to assert that Georgia Power is liable as an arranger due to its understanding that the result of its transaction would be to dispose of hazardous materials. Pls.' Joint Resp. ¶ 49. In General Electric, a electric capacitator manufacturer ("GE") produced waste pyranol (an insulating material that contains PCBs), and stored it in drums. General Elec. Co., 670 F.3d at 380. GE began a business relationship with a paint manufacturing businessman ("Fletcher"), whereby Fletcher purchased scrap pyranol for low prices to use as a plasticizer additive for his paints. Id. Their business relationship continued for over a decade, but deteriorated when Fletcher fell behind in payments, and GE's scrap pyranol fell below purity standards for Fletcher's paint manufacturing. Id. at 380-81. Subsequently, the EPA sought to recover costs from GE for cleaning up leaking drums of scrap pyranol at Fletcher's former storage facility under a theory of arranger liability. Id. at 381-82. The First Circuit affirmed the lower court's determination, following a bench trial, that GE was an arranger within the meaning of CERCLA. Id. at 391.

19

General Electric is distinguishable from this case in two important aspects. First, there was "ample evidence" that GE considered the pyranol as waste material, where it was accordingly labeled and stored in a salvage area, GE pursued various disposal arrangements including local landfills and giving it to employees for weed killer, and GE did not appear to have any quality control where the pyranol was contaminated with other substances or objects. General Elec. Co., 670 F.3d at 385-86. Here, Georgia Power considered the transformers to have some marketable value, where it offered them up for auction, and drained the PCB-laden oil (for separate disposal) from most of its transformers before sale. Second, there was no evidence of any "general demand" for scrap pyranol other than the "idiosyncratic" use that Fletcher had for it. Id. at 386. In this case, there is ample evidence in the record, and in comparison to analogous case law, to show that used transformers, even if they are "scrap" transformers, had a viable market at the time of sale to Ward. Therefore, General Electric is inapposite here.

## CONCLUSION

For the foregoing reasons, defendant Georgia Power's motion for summary judgment is GRANTED. Plaintiffs' motions for summary judgment are DENIED. Plaintiffs' motion to exclude and defendant Georgia Power's motion to strike are both DENIED as moot. Defendant Georgia Power's request for hearing is DENIED as this court elects to decide motions without oral argument pursuant to Federal Rule of Civil Procedure 78(b).

SO ORDERED, this the 31st day of January, 2013.

LOUISE W. FLANAGAN
United States District Judge