IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION


CAROLINA POWER & LIGHT           )
COMPANY d/b/a PROGRESS           )
ENERGY CAROLINAS, INC.,          )
                                 )
              Plaintiff,         )
                                 )
       v.                        )        NO. 5:08-CV-460-FL
                                 )
ALCAN ALUMINUM                   )
CORPORATION, et al.,             )
                                 )
              Defendants.        )


CONSOLIDATION COAL               )
COMPANY,                         )
                                 )
              Plaintiff,         )        NO. 5:08-CV-463-FL
                                 )
       v.                        )
                                 )
ALCAN ALUMINUM                   )
CORPORATION, et al.,             )
                                 )
              Defendants.        )
                                 )


**ORDER**

This matter comes before the court on: (1) plaintiff Carolina Power & Light Company's

("CP&L") motion for partial summary judgment (DE # 975);[1] (2) plaintiff Consolidation Coal

Company's ("Consol") and claimant PCS Phosphate Company's ("PCS Phosphate") motion for

_____

[1]Note that for the convenience of the court, all docket entry numbers in this order are based upon their location in the
CP&L docket, 5:08-cv-460.

partial summary judgment (DE # 977); and (3) defendant Broad River Electric Cooperative, Inc.'s

("Broad River") cross motion for summary judgment (DE # 993). As they relate to these summary

judgment motions, the court will also address in this order: (1) plaintiffs' and claimant's (collectively

"plaintiffs") motion to exclude (DE # 1033); (2) defendant Broad River's motions to strike (DE ##

1042, 1051); and (3) Chemical Products Corporation's motion for leave to file *amicus curiae* reply

brief (DE # 1097). The issues raised are ripe for adjudication. For reasons set forth below,

defendant Broad River's motion for summary judgment is DENIED, plaintiffs' motions for summary

judgment are DENIED, plaintiffs' motion to exclude is GRANTED, defendant Broad River's

motions to strike are DENIED, and Chemical Products Corporation's motion for leave is

GRANTED.

## STATEMENT OF THE CASE

The court's orders dated March 24, 2010, March 30, 2012, and January 31, 2013, contained

a detailed statement of the case, which section the court incorporates here. For ease of reference,

the court repeats and updates much of that summary below.

Plaintiffs CP&L and Consol entered into an administrative settlement with the United States

Environmental Protection Agency ("EPA") in 2005, which obligates them to perform removal

actions at the Ward Transformer Superfund Site ("Ward Site") and to reimburse the EPA for its own

removal costs related to the site, pursuant to the Comprehensive Environmental Response,

Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-9675. Cross-claimant

PCS Phosphate, though not a party to the administrative settlement, entered into a trust agreement

with plaintiffs and has contributed to funding the removal action.

On September 1, 2009, plaintiffs CP&L and Consol filed their consolidated amended complaints against all defendants.[2]  Plaintiffs CP&L and Consol seek contribution toward the costs of removal actions at the Ward Site, pursuant to § 113(f) of CERCLA.[3]  On September 15, 2009, PCS Phosphate counterclaimed against plaintiffs CP&L and Consol, and PCS Phosphate cross-claimed against other defendants seeking cost recovery based on their contribution# to the removal action, pursuant to § 107(a) of CERCLA.  See 42 U.S.C. § 9607(a).

Plaintiffs allege that defendants sent electrical transformers to the Ward Site.  These transformers allegedly contained dielectric fluids that were used as an insulating and cooling medium.  In turn, the dielectric fluid allegedly contained polychlorinated biphenyls ("PCBs").  Plaintiffs identify three groups of defendants: (1) those who sent transformers to the Ward Site for repairs and for the purpose of disposing of PCBs contained therein or some part thereof; (2) those who sent transformers to the Ward Site on consignment and for the purpose of disposing of the transformers and/or PCBs contained therein or some portion thereof; and (3) those who sold transformers to Ward with the intent to dispose of such transformers and/or the PCBs contained therein or some portion thereof.  Plaintiffs maintain that the repair and consignment defendants are

---

[2] Originally, six separate lawsuits were filed by plaintiffs CP&L and Consol between September 12, 2008, and April 30, 2009.  They were consolidated into the two lead cases noted above at a joint scheduling conference, on August 18, 2009.  On September 1, 2009, CP&L's consolidated and second amended complaint and Consol's second amended complaint, each alleged liability against approximately one hundred and forty-four (144) defendants.  Thereafter, the court issued a preliminary case management order, setting forth the phases of discovery (Phase I: Liability and Phase II: Allocation of Costs) and ordering a future discovery status conference.  As Phase I discovery progressed, on July 23, 2010, plaintiff CP&L filed a consolidated and third amended complaint.  For clarification, as defendants continued to be voluntarily dismissed and some were dismissed by order (DE # 277), plaintiffs filed a list of defendants remaining in the case by transaction on November 18, 2011, indicating that one hundred and twelve (112) defendants remained (DE# 630).

[3] Plaintiffs CP&L and Consol originally sought recovery of and/or contribution toward these costs under §§ 107(a) and 113(f) of CERCLA.  However, by order entered March 24, 2010, and September 8, 2010, plaintiffs' § 107(a) cost recovery claims were dismissed.

liable under CERCLA §§ 107(a)(2) and (3), while the sale defendants are liable only under § 107(a)(3).[4]

On October 13, 2009, defendants moved to dismiss the amended complaints and cross-claims. Defendants filed a single omnibus motion pursuant to Rule 12(b)(6) for failure to state a claim for relief, which motion was supplemented by individual defendants or groups of defendants filing additional motions to dismiss on alternative grounds where appropriate. By order entered March 24, 2010, the court denied defendants' omnibus motion to dismiss. Plaintiffs were allowed to proceed on their past owner liability and arranger liability claims. However, the court granted certain defendants' motion to dismiss plaintiffs' § 107(a) cost recovery claims, finding that response costs incurred pursuant to an administrative settlement with the United States are recoverable only under § 113(f).[5] Subsequently, the court ruled on several motions to dismiss particular to individual defendants.

During a status conference with parties' counsel on October 5, 2011, the parties suggested using a test case method to help expedite the discovery process. Magistrate Judge Daniel entered an order memorializing the conference on October 7, 2011, and this court further clarified scheduling issues with regard to test case defendants on November 14, 2011. That order allowed

_____

[4] Section 107(a)(2) makes liable "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). Section 107(a)(3) makes liable "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3).

[5] The parties subsequently stipulated, in consent order dated September 8, 2010, that plaintiffs' § 107(a) cost recovery claims as to the remaining defendants were also dismissed (although cross-claimant PCS Phosphate's § 107(a) cost recovery claims were unaffected).

4

a continuance of Phase I discovery, and laid out motion filing deadlines for the test case to proceed.[6]

All parties were given the opportunity to object to the use of test case defendants or scheduling changes. On November 29, 2011, and upon consideration of such objections, this court amended its order and decided to stay discovery for all other defendants pending the resolution of the test case defendants' motions (DE # 651).[7]

This order addresses only the liability of defendant Broad River (the repairs test case defendant).[8] On February 17, 2012, plaintiffs moved for partial summary judgment against defendant Broad River, which Broad River responded and opposed and plaintiffs replied. Also on February 17, 2012, defendant Broad River cross-moved for summary judgment, which plaintiffs opposed and Broad River replied.

## STATEMENT OF THE FACTS

A.   Ward Site

Since 2004, the Ward Site, which comprises a number of acres near Mt. Herman Road and the Raleigh-Durham International Airport in Wake County, North Carolina, has been subject to a time-critical removal action, as determined by the EPA, for environmental contamination caused by

---

[6] Note that in said order, there were originally three test case defendants: Broad River, Georgia Power Company ("Georgia Power") and Bonner Electric, Inc. ("Bonner Electric"). Bonner Electric subsequently settled, leaving no test defendant in the category of consignments. As discussed below, Broad River is the test case defendant in the category of repairs. An order addressing Georgia Power's liability, as the test case defendant in the sales category, was filed on February 1, 2013.

[7] Also, in the midst of deciding how to proceed with test case scheduling, PCS Phosphate filed three third party complaints (DE ## 633, 634, 635), which some defendants responded to with numerous of motions to extend time to file an answer where parties were attempting to comply with discovery orders. Currently pending on the docket are eleven (11) related motions to dismiss and motion for leave to file surreply, which will be addressed by separate order.

[8] Defendants Georgia Power and Broad River made a motion to extend time to conduct expert discovery on January 3, 2012, and supplemented that motion on January 9, 2012, which plaintiffs responded in opposition on January 10, 2012. This court denied such motion by order for failure to show good cause and prejudice to the plaintiffs on January 12, 2012.

polychlorinated biphenyls ("PCBs"). Pls. Joint SOF ¶¶ 4, 14; Def. Objections & Resps. to Pls. Joint SOF ¶¶ 4, 14. The Site includes a former transformer repair, sales, and reconditioning facility ("the Ward Facility") on eleven (11) acres of land, as well as other adjacent parcels of land.[9] Pls. Joint SOF ¶¶ 14, 17-19, 23; Def. Objections & Resps. ¶¶ 14, 17-19, 23. The PCB contamination may be traced back directly to the Ward Facility, where Ward Transformer Company, Inc. and its successor in business operations Ward Transformer and Sales, Inc. (collectively "Ward") worked on and stored transformers contaminated with PCBs. Pls. Joint SOF ¶¶ 39-49; Def. Objections & Resps. ¶¶ 39-49.[10]

B.    Broad River

Broad River is a South Carolina corporation with its principal place of business in Gaffney. Pls. Joint SOF ¶ 1; Def. Objections & Resps. ¶ 1. Broad River distributes power to residential and industrial members of its electric cooperative in North and South Carolina. Pls. Joint SOF ¶ 78; Def. Objections & Resps. ¶ 78. Broad River installs and uses transformers for its operations, but does not repair or manufacture them. Pls. Joint SOF ¶ 81; Def. Objections & Resps. ¶ 81. Broad River sent Ward three of its transformers, with serial numbers 5064206, 5064207, and 2059260, from substations for repair during the 1980s. Pls. Joint SOF ¶¶ 80, 83, 93; Def. Objections & Resps. ¶¶ 80, 83, 93.

---

[9] "The function and purpose of a transformer is to change an electrical current, typically by lowering or 'stepping down' the voltage. Transformers are composed of 'coils' or 'windings' made of copper or aluminum wire wrapped around an iron core. The core and coil are housed inside a steel tank and submerged under a dielectric fluid ('oil') to cool, insulate, and protect the electrical components. . . . Transformers also often have radiators or bushings attached to the outside of the tank." (CP&L Amend. Compl. ¶ 7.)

[10] The court is providing this information on Ward's general state of contamination for background purposes, as Broad River's transactions with Ward are specifically discussed in the following section. See infra Statement of Facts, Part B.

Broad River itself was not able to provide much documentation of the three transformers at issue because its business was sold in part in the late 1980s and some records were transferred to the buyer.[11] Pls. Joint SOF ¶¶ 80, 82; Def. Objections & Resps. ¶¶ 80, 82. Therefore, Broad River relies on general documentation about its own PCB-related policies and the EPA's regulation and monitoring of PCBs over time, to assert that the three transformers it sent to Ward for repair did not contain PCB-contaminated oil at the time of repair. Pls. Joint SOF ¶¶ 83, 85, 90-91; Def. Objections & Resps. ¶¶ 83, 85, 90-91.

On or around May 11, 1981, Ward received transformer no. 5064206 from Broad River for repair. Wilson Dep. 81. Plaintiffs assert, and Ward's documents show, that the transformer, which had a capacity of 522 gallons of oil, was drained upon arrival in order to perform the requested repairs. Pls. Joint SOF ¶¶ 113-14; Def. Objections & Resps. ¶¶ 113-14. After completing repairs, Ward refilled the transformer oil and tested the PCB level, finding it to be 90.9 parts per million ("ppm"),[12] then billed Broad River and returned the transformer. Pls. Joint SOF ¶ 118; Def. Objections & Resps. ¶ 118.

In 1983 Broad River sent transformer no. 5064207 to Ward for inspection and a repair estimate, which Ward received on or around June 23, 1983.[13] Wilson Dep. 28. This transformer

---

[11]Broad River submitted analysis reports that show in 1995, transformer no. 2059260 had a PCB concentration of less than 2 ppm, and, in 1982, transformer no. 5064206 had a PCB concentration of over 500 ppm, and transformer no. 5064207 had a PCB concentration of less than 50 ppm. (Wilson Depo., Ex. 278.)

[12]Unlike the other two transformers that Broad River sent to Ward, no Ward record produced by plaintiffs documents the PCB level of this transformer before it was drained for inspection and repair.

[13]Defendant Broad River is unable to confirm the date that Ward received the transformer, so that detail is provided by plaintiffs. It is stated here to provide background of the transactions, but not relied upon by this court as a material fact for summary judgment purposes.

also had 522 gallons of oil.[14]  Wilson Dep. 98.  Plaintiffs assert that Ward tested the oil for this transformer when the unit arrived, and recorded a PCB concentration of 10.9 ppm.  Pls. Joint SOF ¶ 124; Def. Objections & Resps. ¶ 124.  Ward then inspected the unit, which involved draining the oil, and reported the results to Broad River.  Pls. Joint SOF ¶¶ 125-27; Def. Objections & Resps. ¶¶ 125-27.  Broad River decided not to have it repaired, and instead left the transformer with Ward to salvage at a sale price of $200, which offset the $1,200 inspection cost.  Pls. Joint SOF ¶¶ 128-29; Def. Objections & Resps. ¶¶ 128-29.  Ward performed repairs on this transformer and subsequently resold it to a third party.  Pls. Joint SOF ¶¶ 130, 133; Def. Objections & Resps. ¶¶ 130, 133.

In 1987 Ward repaired transformer no. 2059260, which Ward had previously sold to Broad River in 1980.  Pls. Joint SOF ¶¶ 134, 137-38; Def. Objections & Resps. ¶¶ 134, 137-38; Wilson Dep. 53.  This transformer was filled to its capacity of 1,500 gallons of oil.  Wilson Dep. 104. Plaintiffs assert that Ward tested the oil on arrival and found a PCB level of 24.1 ppm, and then drained the transformer for repair.  Pls. Joint SOF ¶ 140; Def. Objections & Resps. ¶ 140.  Ward performed repairs on the transformer, then filled it with new oil.  Pls. Joint SOF ¶¶ 141, 146; Def. Objections & Resps. ¶¶ 141, 146; Wilson Dep. 121.  Ward records indicate that on or about February 26, 1988, the new oil tested at 1.8 ppm of PCBs, and Ward returned the transformer soon after that time.  Pls. Joint SOF ¶¶ 147-49; Def. Objections & Resps. ¶¶ 147-49.

## DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

[14]Broad River did not have the capacity to repair or drain any of the transformers it sent to Ward.

56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to find for the non-moving party). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

Summary judgment is not a vehicle for the court to weigh the evidence and determine the truth of the matter, but to determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. Accordingly, the court must examine the materiality and the genuineness of the alleged fact issues in ruling on this motion. Id. at 248-49.

B.    Evidentiary Motions

Broad River has submitted two motions to strike: (1) motion to strike certain materials and statements submitted by plaintiffs; and (2) motion to strike plaintiffs' speculative assertions of fact and inadmissible allegations of habit or routine. As to the first motion, defendant Broad River argues that three affidavits are untimely and contain inadmissible statements and materials. The

9

court excuses plaintiffs' tardy filing of the three affidavits and considers them in its ruling.[15]  One

of the three affidavits, the affidavit of Joe Richard Brewer ("Brewer Affidavit"), attaches Ward

records that go directly to the parties' dispute as to whether the transformers Broad River sent to

Ward contained PCBs.  See Brewer Aff. Re. Broad River Exs. A-E.  As to the second motion,

defendant Broad River seeks to strike plaintiffs' assertions that any leaks or spills of PCB-containing

oil occurred at Ward after 1977 and that any inference of leaks or spills could be made from how

Ward routinely conducted repairs.[16]  Broad River's Mem. in Supp. 2.  Finally, Plaintiffs have moved

to exclude from the court's consideration an affidavit by Richard Westover ("Westover Affidavit")

and his related deposition testimony.  The court will consider these motions in turn below.[17]

Rule 56 provides that "[a] party may object that material cited to support or dispute a fact

cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

Generally, an affidavit filed in support or opposition to a motion for summary judgment must present

evidence in substantially the same form as if the affiant were testifying in court.  Evans v.

Technologies Applications & Service Co.,80 F.3d 954, 962 (4th Cir.1996).  Federal Rule of Civil

Procedure 56(e) specifically requires that affidavits submitted on summary judgment contain

admissible evidence and be based on personal knowledge.  Id.; see also Williams v. Griffin, 952

---

[15] The court will allow Broad River the opportunity to cross-examine the affiants, if Broad River desires to do so as the case moves forward.

[16] Broad River also seeks to strike the assertion that all oil filled transformers contained PCBs, which is an assertion not actually stated by plaintiffs.  Broad River Mem. in Supp. 2.  The court seeks only to ascertain the PCB content of the transformers at issue in this case and as this particular defendant, which issue is discussed in the analysis below.

[17] Chemical Products Corporation's motion for leave to file *amicus curiae* reply brief is also pending before this court.  For good cause shown, the motion for leave is GRANTED, and said brief is noted by the court.  The court does not, however, reach some issues raised by the brief in this order because of its finding that there is a genuine dispute of material fact.  To the extent that the *amicus* brief seeks to have the court re-examine its previous determination that a transformer may be properly identified as a "facility" within the meaning of CERCLA, such request is denied.

F.2d 820, 823 (4th Cir.1991) (evidence submitted in opposition to summary judgment motion must be admissible and based on personal knowledge). Thus, summary judgment affidavits cannot be based upon inadmissible hearsay. See Maryland Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1252 (4th Cir. 1991).

1.  Broad River's Motion to Strike Certain Materials and Statements

As an initial matter, the court will consider whether Ward's business records (attached to the Brewer Affidavit) are inadmissable hearsay or fall within an exception. Hearsay, defined by Federal Rule of Evidence 801(c), "means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." A "statement" includes a "written assertion." Rule 801(a). Ward's business records are statements that were not made at the time of the declarants' testimony. Furthermore, they are being offered to show the truth of their assertions, most consequentially that Broad River's transformers contained PCBs. Therefore, the records are hearsay under Rule 801.

Rule 803 provides "exceptions" to the hearsay rule for when statements are admissible despite being hearsay because they are otherwise considered reliable evidence. One such exception is for statements in ancient documents: "A statement in a document that is at least 20 years old and whose authenticity is established." Rule 803(16). To establish authenticity, Rule 901 requires: "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 901(a). Specifically included as illustrative examples to this rule are testimony of a witness with knowledge, distinctive characteristics, and evidence about ancient documents.[18] Rule 901(b). Authenticity is not a particularly high hurdle for a party to meet. See United States

_____

[18] Note that the list provided in Rule 901 is non-exclusive and the court may consider any indicia of authenticity to determine admissibility.

11

v. Patterson, 277 F.3d 709, 713 (4th Cir. 2002) (proffering party needs only to introduce sufficient evidence to provide jury with basis to resolve authenticity question in his or her favor.)

The parties do not dispute that the Ward records are at least twenty (20) years old, but only that they have proper "authenticity" to be admitted under the ancient documents exception to the hearsay rule.[19]  Broad River's Mem. in Supp. of Mtn. to Strike Certain Materials 16.  In his September 2010 deposition, Brewer indicated his familiarity with Ward business practices as an employee of the company.  Brewer Dep. 8-15, 51-53 (Sept. 29, 2010).  Brewer had experience preparing, handling, and reading Ward's documents during the course of his employment, was familiar with how Ward's records were created and by whom, and was familiar with the handwriting of many of his coworkers.  See, e.g., id. at 213-304 (discussing the creation and content of various Ward records).  The focus of his January 10, 2012, affidavit is to describe and explain the documents relating to each of the three repair transactions that took place between Ward and Broad River.  Brewer Aff. ¶ 2.  Brewer had the opportunity to inspect and review each document attached to his affidavit.  Brewer Aff. ¶¶ 9, 11, 12, 14, 29.  The testimony of Brewer, therefore, fits squarely into authentication through testimony of a witness with knowledge under Rule 901(b)(1).  Brewer has personal knowledge about these documents and can attest that they are Ward records.

Furthermore, the documents have distinctive characteristics which identify them to be Ward records, similar to others submitted by plaintiffs.  See Rule 901(b)(4).  For example, Exhibit A to Brewer's affidavit contains six pages that are numbered with a capital "A" followed by a dash and six digits, in the lower right hand corner, with a bold font.  Brewer Aff. Ex. A.  This is precisely how Exhibit 56 of the Brewer deposition is numbered.  Brewer Dep. Ex. 56.  There are a few numbering

---

[19] Note the parties also dispute whether Ward's records are admissible under the business record exception to the hearsay rule.  As the court finds the records admissible as ancient documents, it need not reach this issue.

systems that indicate Ward records, which are similarly reflected on each page of each exhibit attached to the Brewer Affidavit. Brewer Aff. Exs. A-E. Furthermore, many of the records appear to be on pre-printed forms with Ward letterhead. See, e.g., id. at Ex. E (composed of inventory sheets, inspection and repair records for transformer no. 5064207). That same letterhead is also found on other Ward records. Brewer Dep. Exs. 50-81, 90-110; Aguirre Dep. Exs. 542-47. Therefore, these documents, on their face, have distinctive characteristics that authenticate them as well. See Patterson, 277 F.3d at 713-14 (discussing authentication through "internal patters or other distinctive characteristics, taken in conjunction with circumstances" to authenticate an image of defendant's fingerprints when the witness was not competent to testify about the generation of the image).

Finally, with respect to an ancient document specifically, Rule 901(b)(8) provides that authenticity may be established with a showing it is "in a condition that creates no suspicion about its authenticity, [and] was in a place where, if authentic, it would likely be." When these documents were originally turned over to defendants, a discovery dispute about their organization ensued. By order on January 13, 2011, a magistrate judge examined the condition and place of all the Ward records. In September 2005, EPA issued an Administrative Order on Consent ("AOC"), which was used by EPA to determine how Ward records would be preserved. Order 16-17. The bulk of said records (approximately 87,000 pages of original customer records, ledger books and other documents) were stored at the Iron Mountain facility where they were kept in their original form.[20] Under the circumstances, where Ward has ceased operations subsequent to its designation as a

---

[20] Broad River protests that plaintiffs should make the original documents available for inspection. As discussed below, the court will deny summary judgment. Despite the multiple indicia of authenticity discussed in this section, should Broad River still request inspection of the originals, the parties may arrange such inspection before trial.

Superfund site by EPA, the documents are in a location and condition that would be expected. Therefore, for all of the reasons discussed above, these documents are admissible under the ancient documents exception of the hearsay rule. Broad River's motion to strike certain materials and statements is DENIED.

        2.        Broad River's Motion to Strike Plaintiff's Speculative Assertions

Broad River's second motion raises issues of relevancy under Rules 401 and 403, in addition to questions of routine practice under Rule 406. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Rule 401. Generally, relevant evidence is admissible unless otherwise prohibited by the rules. Rule 402; United States v. Boyd, 53 F.3d 631, 636 (4th Cir. 1995). For example, "[e]vidence which is essentially background in nature . . . is universally offered and admitted as an aid to understanding." Editors' Notes to Rule 401. However, the counter to Rule 401, is Rule 403, which provides the court with discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice,[21] confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Rule 403. "Relevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case, and thus are generally not amenable to broad *per se* rules." Sprint/United Management Co. v. Mendelsohn, 552 U.S. 379, 387 (2008).

---

[21] "Unfair prejudice" means "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Editors' Notes to Rule 403. For example, in Old Chief v. United States, 519 U.S. 172 (1997), the Supreme Court ruled that it is unfairly prejudicial under Rule 403 to refuse a defendant's stipulation to a prior conviction element of a criminal offense and allow the prosecution to put forth evidence of that prior conviction, even though such evidence is relevant under Rule 401, because of the risk the jury would misuse such evidence.

Broad River first asserts in its second motion: "There is simply no credible evidence that leaks or spills of oil occured with any regularity at Ward after 1977." Mem. in Supp. 2. Broad River then moves to strike any assertions to the contrary. Id. In support, Broad River cites to its own statement of facts, stating Ward had policies it adopted by 1977 to prevent spills. Id. at 9. That statement is supported by a discovery document where PCS Phosphate responded to Broad River with the following: "PCS admits that Ward's general policy, after 1980, was to attempt to comply with regulatory PCB disposal requirements, but PCS denies that said policy was followed in every instance." Broad River SUMF, Ex. 39 ¶ 16. Broad River also cites depositions where employees of Ward discuss what they would do to prevent and clean oil spills or drips. Mem. in Supp. 9-10. Specifically, Broad River focuses on the deposition of Keith Reed. Id. Broad River claims that Reed was the "Operations Manager over the Oil-Filled Department in the 1980s"[22] and that Ward employees utilized preventative spill measures as "standard operating procedure." Id.

Plaintiffs, by contrast, have produced the testimony of five different Ward employees who all assert that they observed and knew of oil to spill or leak at the Ward site during repairs, including during the 1980s. See Rappleyea Dep. 9, 14-16; Ostby Dep. 9, 23, 39; Aguirre Dep. 139; Hicks Dep. 28-54; Brewer Dep. 77-82, 91-94. These employees either repaired transformers or observed transformer repair during their time at Ward. Ward's oil spills during the repair of transformers in the 1980s, and their frequency or regularity is certainly relevant in this case where plaintiffs are seeking recovery of costs for cleaning up environmental damage at Ward due to PCB-containing oil leaks. Furthermore, it is closely tied to a theory of the case that plaintiffs assert, which is that Ward

---

[22] Reed in fact began his employment with Ward in 1986, as a consultant working to design and build equipment that measured current flowing into a transformer. Reed Dep. 12-14. After about six months, Reed became VP of Engineering. Id. at 16-17. The floor (a.k.a. Oil-Filled Transformer Department), where transformers were actually repaired, was managed by Aguirre. Id. at 17-18.

15

employees did not follow, due to lack of knowledge or training, Ward's contamination policies. Furthermore, the policies and procedures outlined in the Reed deposition focus on how to clean up oil after it has already dripped on to the floor. Reed Dep. 77, Ex. 631. As EPA found out during its clean up of the contaminated Ward site, once oil got on the floor it traveled through porous concrete and into the ground below. Therefore, defendant Broad River's assertion that there is no credible evidence that spills occurred after 1977 is unfounded. Furthermore, such evidence of Ward employees as to what happened on the Ward site during that time is relevant and does not unfairly prejudice Broad River. Therefore, plaintiffs' evidence is admissible under Rule 402, unless otherwise prohibited by the rules.

Broad River also asserts that plaintiffs' evidence of routine practice at Ward that oil would drip or spill during repairs of transformers is inadmissible pursuant to Rule 406. "Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness." Fed. R. Evid. 406. "To qualify as a habit or routine practice, conduct: (1) must be reflexive or semiautomatic as opposed to volitional, (2) must have particularity or specificity,[23] and (3) must be characterized by regularity or numerous examples." Fed. R. Evid. 406, Advisory Committee Note. A habit is "a person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time." Id.

---

[23]The court recognizes that a "general habit of being environmentally unfriendly is not enough to allege a pattern of conduct," for admission of evidence pursuant to Rule 406. O'Connor v. Boeing North American, Inc., Nos. CV 974554 DT (Rcx), et al., 2005 WL 6035256, at *32 (C.D. Cal. Aug. 9, 2005) (unpublished).

The threshold issue raised by plaintiffs is whether the evidence defendant Broad River seeks to strike is properly characterized as habit evidence, or if it is simply eyewitness testimony. Pls. Joint Resp. 3-4. Plaintiffs contend that there were oil spills during each repair, and that fact is established through testimony of employees, not because of their own practices or conduct, but because of the nature of working on transformers. Id. While this assertion may be true, defendant Broad River seeks to strike a larger category of evidence presented by plaintiffs, which includes routine practices.

A repeated line of questioning in the plaintiffs' depositions of Ward employees dealt with which "release pathways" facilitated the escape of oil during repairs of transformers. An employee would discuss a certain type of transformer and walk through all the possible repairs that might be done on that transformer. For each type of repair, the employee would indicate how it would be conducted, and through what "release pathways" oil might escape to contaminate the Ward site. For example, when a padmount transformer needed to be rewound, an employee would drain the oil, if any, and lift the core and coil out of the transformer. Hicks Dep. 34. The release pathways would include dripping on the floor as the core and coil were lifted out, as well as the release of oil onto the employees hands, which would then contaminate the sink and plumbing with oil when washed. Brewer Dep. 132-33; Rappleyea Dep. 33-34; Otsby Dep. 55-56. This line of testimony includes not only the facts of what happened, but the specific and habitual manner in which employees of Ward handled repairs. Furthermore, this conduct is being used to assert that the repairs at issue with respect to Broad River specifically, were conducted in that same routine manner, leading to the same routine releases of oil. Pls. Joint SOF ¶ 49; Def. Objections & Resps. ¶ 49. Therefore, the contested

evidence does include habit or routine practice as governed by Rule 406, and must be examined in that context.

As discussed above, the evidence of the routine manner in which transformer repair work was conducted came from five different Ward employees, covering over four decades of repeating the same processes, with the same release pathways.[24]  Therefore, it is "characterized by regularity" under Rule 406.  Rule 406, Advisory Committee Note; <u>see also</u> <u>Freedman v. Am. Online, Inc.</u>, 325 F.Supp. 2d 638, 650 n.24 (E.D. Va. 2004) (admitting the testimony of an employee who testified that she typically made sure that a warrant was signed by a judge before releasing information).  Furthermore, although there are admittedly broad assertions in some of the testimonial evidence, the Ward employees lay out with specificity the ways that transformer repairs are handled in each particular circumstance to support their more general observations.  <u>Compare</u> Ostby Dep. 23 ("If you touch an oil-containing transformer, you're going to get oil on yourself.") <u>with</u> Rappleyea Dep. 27 (claiming, more specifically, that removing the core and coils from an oil-filled transformer would result in the release of oil "100 percent" of the time because they were placed in pans or upon absorbent materials that would overflow or leach onto the floor and would continue to drip oil even after draining overnight).  Therefore, this evidence is admissible pursuant to Rules 406 and 402.

Broad River argues for a *per se* rule against using habit or routine evidence when dealing with a service provider and its customers because of the varied an irregular nature of such transactions, citing in support <u>Genesis Telecomms., LLC v. Moore</u>, No. 8:08–1715–JMC–BHH, 2010 WL 6407918, at *3 (D.S.C. Oct. 18, 2010) (unpublished).  Mem. in Supp. 5.  In <u>Genesis</u>,

---

[24] Rappleya conducted repairs on transformers at Ward from 1974 to 2006, Rappleyea Dep. 9-10; Ostby worked at Ward from 1972 to 2006, Ostby Dep. 8-10; Hicks worked at Wrd from 1966 to 2006, Hicks Dep. 9; Aguirre, who worked on transformer repair and then became a manager of the oil-filled transformer department, was at Ward from 1979 to 2008, Aguirre Dep. 8-12; Brewer worked at Ward in various positions from 1965 to 2007, Brewer Dep. 9-10.

plaintiff (a provider of telephone, internet and computer services) sued defendant (a subsidized telecommunications carrier) for tortious interference with twenty-six (26) contracts. <u>Genesis Telecomms.</u>, 2010 WL 6407918, at *1. Defendant moved for summary judgment, and plaintiff opposed in part due to its alleged habit evidence based upon the details related to two instances of tortious interference, involving seven contracts. <u>Id.</u> at 3.

The court declined to admit such evidence as to sixteen (16) other customers because: (1) responding in a service capacity to unique and diverse customer needs is not conduct that lends itself to "almost identical repetition;" and (2) plaintiff offered only two instances of such conduct to prove sixteen (16) additional instances of alleged wrong. <u>Id.</u> <u>Genesis</u> is inapposite here because: (1) the routine conduct at issue in this case is standard repair services on transformers, which lend themselves to repetition; and (2) the Ward employees worked for decades at a plant that repaired thousands of transformers, and plaintiffs seek to have their routine practices admitted to show how the three transformer repairs at issue here were handled. Pls. Joint Resp. 8. Therefore, defendant Broad River's motion to strike plaintiffs' speculative assertions is DENIED.

3.    Plaintiffs' Motion to Exclude

The court considers next plaintiffs' motion to exclude the Westover affidavit and related deposition testimony. Upon review, the court finds the unopposed motion to be well-founded and hereby GRANTS said motion to exclude for good cause shown.[25]

Having now determined the range of evidentiary materials properly before the court, the court turns to the issue of liability of defendant Broad River.

_____

[25] In any event, however, the court notes that the Westover affidavit is not particularly relied upon by defendant Broad River to support any disputed issue of material fact.

C.    Liability of Broad River

Broad River sent three of its transformers allegedly containing PCB-laden oil to Ward for inspection and repair in the 1980s. One of them remained with Ward as scrap based on inspection for a $200 salvage allowance. The liability alleged against defendant Broad River is based upon two culpable statuses in CERCLA, "arranger" under § 107(a)(3) and past "facility owner at the time of disposal" under § 107(a)(2).

In order to establish a prima facie case of arranger liability under 42 U.S.C. § 9607, a plaintiff must show: (1) that the defendants owned or possessed hazardous substances; (2) that they, by contract, agreement or otherwise, arranged for disposal or treatment, or arranged for transport for disposal or treatment of those substances at a facility; (3) that there was a release or threatened release of a hazardous substance at the site; and (4) that the release or threatened release caused the incurrence of response costs. United States v. Ward, 618 F. Supp. 884, 893-94 (E.D.N.C. 1985).

To establish past owner or operator liability under CERCLA, plaintiffs must show: (1) "that the defendant 'owned or operated' a 'facility' from which there was a 'release' or 'threatened release' of a hazardous substance," Westfarm Assoc. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n, 66 F.3d 669, 677 (4th Cir. 1995); (2) that the defendant owned or operated the facility "at the time of disposal," 42 U.S.C. § 9607(a)(2); and (3) "that the plaintiff[s] incurred necessary cleanup costs 'consistent with the national contingency plan,'" Westfarm, 66 F.3d at 677.[26] Any

---

[26]Facility is defined to include not only buildings and natural physical features, but also "equipment," "storage containers," or any "site or area where a hazardous substance has been deposited, stored, disposed of, or place, or otherwise come to be located," thus including the transformers themselves. 42 U.S.C. § 9601(9). "Release" is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." Id. § 9601(22). "Disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such . . . waste or any constituent thereof may enter the environment." Id. §§ 6903(3), 9601(29). It is undisputed that PCBs are a "hazardous substance" as defined by 42 U.S.C. § 9601(14) and that defendants are "persons" as defined by 42 U.S.C. § 9601(21).

owner or operator of a facility is liable "whether or not such owner or operator was the cause of the disposal or, indeed, even had knowledge of it," Crofton Ventures Ltd. P'ship. v. G&H P'ship, 258 F.3d 292, 297 (4th Cir. 2001), and whether or not the owner had an "active role" in managing or overseeing the facility, see Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 844 (4th Cir. 1992).

Turning first to the third element of past owner liability, this court examines whether the plaintiffs incurred costs consistent with the national contingency plan ("NCP"). The NCP states: "Any response action carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA or a consent decree entered into pursuant to section 122 of CERCLA, will be considered 'consistent with the NCP.'" 40 C.F.R. § 300.700(c)(3)(ii). Plaintiffs have shown that EPA determined PCBs were located at Ward at levels requiring critical removal action to protect public health, welfare and the environment. (EPA's 2004 Ward Determination.) In 2005 plaintiffs settled with the EPA and signed an Administrative Order on Consent ("AOC")[27] to pay for the cost of cleanup at Ward. The AOC was issued on the basis of CERCLA, including sections 106 and 122, and was complied with to carry out response actions.[28]

Broad River claims that plaintiffs did not incur costs consistent with the NCP cleaning up their facilities (the three repaired transformers), because plaintiffs cleaned up the Ward site. (Broad River's Reply Mem. 18.) However, there can be multiple facilities in a single case, any one of which is sufficient to show liability. See, e.g., Westfarm Assoc., 66 F.3d at 680; United States v. Mexico Feed & Seed Co., 980 F.2d 478, 484 (8th Cir. 1992); Reading Co v. City of Philadelphia,

[27]Provided to the court in Consol's Second Am. Compl., Ex. C.

[28]Broad River's assertions that plaintiffs should have conducted independent studies and that the AOC is not consistent with the NCP are in direct contradiction with EPA findings and CERCLA.

823 F.Supp. 1218, 1235 (E.D.Pa. 1993). Furthermore, CERCLA section 107(a)(2) defines covered person to include "any person who at the time of disposal of any hazardous substance owned or operated *any facility* at which such hazardous substances were disposed of." 42 U.S.C. 9607 (emphasis added). The court must construe CERCLA provisions broadly, consistent with the remedial purpose of the statute. <u>Westfarm Assoc.</u>, 66 F.3d at 677. Therefore, this court finds that plaintiffs have satisfied the third element for past owner liability, that they incurred costs consistent with the NCP.[29]

To be a PRP under CERCLA, whether Broad River is an arranger or past owner, its transformers must have contained a "hazardous substance." In this case, defendant Broad River maintains that its transformers did not contain any PCBs, but only mineral oil when sent to Ward for repair. Def.'s Mem. in Supp. 5. In support of this assertion, Broad River points to the absence of any of its own records of PCBs in those transformers at the time of repair, and general statistical data from the Environmental Protection Agency ("EPA"), showing that most transformers did not contain PCBs by the late 1970s. <u>Id.</u> Plaintiffs contend that Broad River's transformers did contain PCBs based on Ward's records of two of the transformers sent to Ward for repair, stating that they tested positive for the hazardous substance before they were drained, and expert testimony that the manufacturing numbers of Broad River's transformers indicate they were produced at a time when PCBs were likely to have been used in the transformer oil. Pls. Joint SOF ¶¶ 96-102. Broad River responds that Ward's testing methods were not reliable.

There is no question that the presence or absence of PCBs is a material fact to determine Broad River's liability. If the transformers did not contain any PCBs, Broad River is not liable as

---

[29]Under the same reasoning, the court finds that plaintiffs have satisfied the fourth element of arranger liability, that the release or threatened release caused the incurrence of response costs, with respect to defendant Broad River.

an arranger or previous owner. If the transformers did contain PCBs, Broad River may be held liable as an arranger and/or owner, provided that the other elements of arranger or owner liability can be shown.[30] The remaining issue on plaintiffs' motion for summary judgment thus is whether Broad River's factual challenges, substantially based upon statistical data from EPA, raise a genuine issue as to whether PCBs were present in their transformers.

Even though both parties are moving for summary judgment, a trial is not automatically waived where the court must "resolve conflicts in the evidence on summary judgment motions." TWFS, Inc. v. Schaefer, 325 F.3d 234, 241 (4th Cir. 2003) (finding that the district court improperly granted summary judgment). Here, as in Schaefer, the parties seek to have the court to weigh statistical evidence and technical data requiring expert interpretation to make a finding of fact. See id. This type of evidentiary finding of fact is improper at the summary judgment stage. See id. Therefore, both plaintiffs' and defendant's motions for summary judgment as to the liability of Broad River are DENIED.

## CONCLUSION

For the foregoing reasons, defendant Broad River's motion for summary judgment is DENIED. Plaintiffs' motions for summary judgment are DENIED. Defendant Broad River's motions to strike are DENIED. Plaintiffs' motion to exclude is GRANTED. Chemical Products

---

[30]The court finds that the parties' dispute over whether PCBs contaminated the Ward site at the time of repairs to Broad River's transformers is also an issue of material fact, even if the transformers contained PCBs. For example, even if plaintiffs could show Broad River's transformers contained PCBs, satisfying the first and second elements of arranger liability (that the defendants owned or possessed hazardous substances, and that they, by contract, agreement or otherwise, arranged for disposal or treatment, or arranged for transport for disposal or treatment of those substances at a facility), there would still be an issue as to the third element (whether there was a release or threatened release of a hazardous substance at the site) because Broad River contends no releases occurred in the 1980's. Similarly, the second element of previous owner liability requires ownership of the facility *at the time* of disposal.

23

Corporation's motion for leave is GRANTED. Defendant Broad River's request for a hearing is

DENIED.

SO ORDERED, this the 18th day of February, 2013.

_____
LOUISE W. FLANAGAN
United States District Judge